## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JEFFREY SIEGEL, Administrator of the Estate of MOUSTAPHA AKKAD, deceased, and MOUSTAPHA AKKAD's heirs; SOOHA AKKAD, individually; SUSAN GITELSON, Special Administrator of the Estate of RIMA AKKAD MONLA, deceased, and RIMA AKKAD MONLA's heirs, ZIAD MONLA, individually, and on behalf of his minor sons; and MICHAEL BUTLER, | No. |
| Plaintiffs, | |
| v. | |
| HSBC HOLDINGS, PLC ("HSBC-HOLDINGS"); HSBC NORTH AMERICA HOLDINGS INC. ("HSBC N.A. HOLDINGS"); HSBC BANK USA, N.A. ("HSBC BANK-USA"); HSBC SECURITIES (USA) INC.; HSBC FINANCE CORPORATION; HSBC USA INC. ("HSBC-USA"); HSBC BANK MIDDLE EAST LIMITED ("HSBC MIDDLE EAST"); and AL RAJHI BANK f/k/a AL RAJHI BANKING and INVESTMENT CORPORATION, | |
| Defendants. | |

## <u>COMPLAINT AT LAW</u>

Plaintiffs, JEFFREY SIEGEL, Administrator of the Estate of MOUSTAPHA AKKAD, deceased, and MOUSTAPHA AKKAD's heirs; SOOHA AKKAD, individually; SUSAN GITELSON, Special Administrator of the Estate of RIMA AKKAD MONLA, deceased, and RIMA AKKAD MONLA's heirs, ZIAD MONLA, individually, and on behalf of his minor sons; and MICHAEL BUTLER, complaining of defendants HSBC-HOLDINGS, HSBC BANK-USA, HSBC N.A. HOLDINGS, HSBC-USA, HSBC MIDDLE EAST, and AL RAJHI BANK, state:

## NATURE OF THE ACTION

1.     "Money is the oxygen of terrorism - without the means to raise and move money around the world, terrorists cannot function," said Colin Powell.  This civil action is brought on behalf of nationals of the United States that are victims of a terrorist bombing that was accomplished in the complicity with a number of financial institutions, pursuant to the Anti-Terrorism Act, 18 U.S.C. § 2331, 18 U.S.C. § 2333, 18 U.S.C.  § 2339A, 18 U.S.C.  § 2339B, and 18 U.S.C. § 2339C.

2.     On November 9, 2005 (i.e., 9/11/05 in the Arabic calendar) in Amman, Jordan, *al-Qaeda in Iraq* ("*AQI*") perpetrated coordinated bombings of three hotels - the Grand Hyatt Amman, the Radisson SAS and the Days Inn.

3.     One of the hotels targeted by the *AQI* suicide bombers was the Grand Hyatt Amman, where Plaintiff's Decedent, Moustapha Akkad and his daughter, Rima Akkad Monla, both nationals of the United States, were killed, and hundreds were injured, including Michael Butler and Sooha Akkad, both nationals of the United States.

4.     The Amman Jordan Terrorist Attack of 9/11/05 was carried out by four suicide bombers using material support and resources provided and/or facilitated by the Defendants that

2

ignored links to terrorist financing among its customers, including, but not limited to customers with ties to notorious terror groups, *al-Qaeda* and *AQI*.

5.      Specifically, for over a year leading up to the attacks, *AQI* (from its operational base in Iraq) was planning the Jordanian attacks by selecting targets, recruiting and training the bombers, constructing the bombs, and smuggling the bombers into Jordan by utilizing funds and funding obtained through terrorist financing groups by way of the Defendants' financial institutions.

6.      For international operations such as the Jordanian bombing, *AQI* relied upon funding from Osama bin Laden's central *al-Qaeda* operation and fundraising, and movement of funds, outside of Iraq.

7.      But for the Defendants' willingness to facilitate terrorist financing, *AQI* could not have planned or performed the heinous attacks in Jordan that resulted in injury and death to Plaintiffs and Plaintiffs' decedents.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this matter and over the defendant pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2333(a). Venue is appropriate pursuant to 18 U.S.C. § 2334(a), 28 U.S.C. 1391(b)(2) and 28 U.S.C. 1391(c)(3).

## THE PARTIES

**Moustapha Akkad**

9.      Plaintiff, Jeffery Siegel, a resident of California, brings this action on behalf of the Estate of Moustapha Akkad as its Administrator.  Additionally, Mr. Akkad's heirs, Sooha Akkad, Tarek Akkad, Malek Akkad, and Zade Akkad, all Plaintiffs herein, are all U.S. citizens.

10.     On November 9, 2005, Moustapha Akkad, a national of the United States, was a registered guest at the Grand Hyatt Amman and was located in the lobby of said hotel when a suicide bomber detonated the explosives.

11.     As a proximate result, Moustapha Akkad sustained injuries of personal and pecuniary nature that resulted in his death on November 11, 2005.

12.     Moustapha Akkad, a national of the United States, left surviving him Sooha Akkad, his wife, and his three sons, Tarek Akkad, Malek Akkad and Zade Akkad, each of whom has experienced grief and sorrow as well as the loss of love, affection, care, attention, companionship, comfort, guidance, protection, and financial support due to the death of Moustapha Akkad.

**Sooha Akkad**

13.     Plaintiff, Sooha Akkad, a national of the United States, brings this action individually.

14.     On November 9, 2005, Sooha Akkad was a registered guest at the Grand Hyatt Amman and was located in the lobby of said hotel when the *AQI* bomber detonated his explosives.

15.     As a proximate result, Sooha Akkad, a national of the United States, sustained injuries of personal and pecuniary nature.

**Rima Akkad Monla**

16.     Plaintiff, Susan Gitelson, an Illinois resident, Special Administrator of the Estate of Rima Akkad Monla, brings this action on behalf of Rima Akkad Monla's heirs, Ziad Monla and her two sons, Tarek Monla, a minor, and Moustapha Monla, a minor, each of whom has experienced grief and sorrow as well as the loss of love, affection, care, attention,

companionship, comfort, guidance, protection, and financial support due to the death of Rima Akkad Monla.

17.     Rima Akkad Monla, a national of the United States, was also a registered guest at the Grand Hyatt Amman and was located in the lobby of said hotel when the suicide bomber detonated his explosives.

18.     As a proximate result, Rima Akkad Monla sustained injuries of personal and pecuniary nature prior to her death on November 9, 2005.

19.     Rima Akkad Monla, a national of the United States, is survived by her husband, Ziad Monla and her two sons, Tarek Monla, a minor, and Moustapha Monla, a minor.  Ziad Monla, as an heir of Rima Akkad Monla, brings this action on his own behalf and on behalf of his minor sons.

**Michael Butler**

20.     Plaintiff, Michael Butler, a national of the United States, brings this action individually.

21.     On November 9, 2005, Michael Butler was a registered guest at the Grand Hyatt Amman and was located in the lobby of said hotel when Abed detonated the explosives.

22.     As a proximate result, Michael Butler, a national of the United States, sustained injuries of personal and pecuniary nature.

**The Defendants**

**a)  The HSBC Defendants**

23.     HSBC Holdings, PLC, ("HSBC Group") is a financial institution holding company organized under the laws of England and Wales, headquartered in London, with the principal

5

office of its chief executive in Hong Kong.  HSBC is one of the largest financial institutions in the world, with over $2.5 trillion in assets; it has operations in over eighty countries, with hundreds of affiliates all over the world.

24.     HSBC North America Holdings, Inc., with assets of approximately $345 billion, is headquartered in New York City, with offices in Illinois, and, through various subsidiaries, owns key HSBC financial institutions in the United States: HSBC Bank USA, N.A., HSBC Securities (USA) Inc., HSBC Finance Corporation and HSBC USA Inc.,  (collectively, "HSBC US").  The HSBC U.S. entities primarily provide a U.S. platform for HSBC's non-U.S. clients.

25.     HSBC Bank USA, N.A. is located in Mettawa, IL and McLean, Virginia, with its principal office located in New York City.

26.     HSBC Securities (USA) Inc. is headquartered in New York, New York, with a registered agent in Illinois.

27.     HSBC Finance Corporation is headquartered in Mettawa, Illinois, with a registered agent in Illinois.

28.     HSBC USA, Inc. is headquartered in New York, New York.

29.     HSBC Bank Middle East Limited ("HSBC-Middle East"), is a financial institution incorporated in Jersey in the Channel Islands.  HSBC-Middle East oversees a network of financial institutions throughout the Middle East and Northern Africa, including Jordan, Kuwait, Pakistan, Qatar and the United Arab Emirates.  HSBC-Middle East offers "HSBC Amanah" services to many of its clients in the Middle East, which is a "global Islamic financial services division" designed to "serve the particular needs of Muslim communities" in compliance with Islamic law.

30.    These HSBC Defendants were, at all relevant times leading up to the November 9, 2005 Jordanian hotel bombings, "offering a gateway for terrorists to gain access to U.S. dollars and the U.S. financial system," failing "to take reasonable steps to ensure it is not dealing with banks that may have links to or facilitate terrorist financing," "opening U.S. correspondent accounts for high risk affiliates without conducting due diligence," "facilitating transactions that hinder[ed] U.S. efforts to stop terrorists," and "providing U.S. correspondent services to banks with links to terrorism,"[1] and thereby aiding and abetting terrorist organizations, including *AQI*.

31.    For decades, HSBC, despite being aware of the terrorist financing risks in the Middle East, and, in particular, Saudi Arabia, has been banking through various affiliates in the area and doing business with Saudi Arabia's largest private financial institution, Al Rajhi Bank.

32.    At all relevant times, each and every HSBC Defendant was fully aware of the suspicions that Al Rajhi Bank and its owners were associated with terrorist financing - specifically, that in 2002, the name of the bank's most senior official, Sulaiman bin Abdul Azis Al Rajhi appeared on a list of twenty 'Golden Chain' wealthy investors who supported *al-Qaeda*; that a 2003 report by the Central Intelligence Agency referred to the bank as a "Conduit for Extremist Finance"; that a U.S. indictment in February 2005 charged two individuals with cashing $130,000 in U.S. travelers checks at Al Rajhi Bank in Saudi Arabia and smuggling the money to violent extremists in Chechnya; that the U.S. Treasury Under Secretary for Terrorism and Financial Intelligence, in July of 2005, had testified that "Saudi donors may still be a significant source of terrorist financing, including the insurgency in Iraq"; and that

---

[1] *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing*: HSBC Case History; United States Senate Permanent Sub-Committee on Investigations; Majority and Minority Staff Report. July 17, 2010; pages 3-7, 238-239.

individuals and entities that had been designated as terrorist organizations were clients of Al

Rajhi Bank - yet, continued to do business with Al Rajhi, even after its compliance department

recommended that, due to terrorist financing concerns, that HSBC affiliates should sever ties

with Al Rajhi Bank.

**b)  Al Rajhi Bank**

33.     Al Rajhi bank is Saudi Arabia's largest private bank, holding $80 billion in assets.

34.     The bank began as a collection of banking and commercial ventures, which, in 1978,

joined together as Al Rajhi Trading and Exchange Company.  In 1987, the company converted to

a joint stock company and two years later re-named itself Al Rajhi Banking and Investment

Corporation.  In 2006, the bank re-branded itself as Al Rajhi Bank.

35.     Headquartered in Riyadh, Saudi Arabia, Al Rajhi Bank has over 500 branches–mostly

in Saudi Arabia, but also in Malaysia, Kuwait, and Jordan.

36.     At all relevant times, Al Rajhi Bank and its owners were associated with terrorist

financing and provided accounts to clients linked with terrorism (to wit, the *al-Haramain Islamic

Foundation* and *Soliman Al-Buthe*, both designated by the U.S. as linked to terrorism, and the

*International Islamic Relief Organization* which is known for "facilitating fundraising for

*al- Qaeda*" are all Al Rajhi Bank clients).

### *AL-QAEDA IN IRAQ (AQI)*

37.     Abu Musab al-Zarqawi ("Zarqawi") was a militant Islamist from Jordan who, in the

1990s, ran a terrorist training paramilitary camp supported by *al-Qeada* in Afghanistan.

38.     Near the turn of the century, in Iraq, Zarqawi formed *al-Tawhid wal-Jihad*, which

eventually changed its name to *al-Qaeda in Iraq*.  This terrorist group had financial ties to

*al-Qaeda*, *Asbat an-Ansar*, *Afgan Jihad*, the *International Mujaheddin Movement*, and *Hizballah*.

39.     Zarqawi's goals were to overthrow the Jordanian monarchy, eradicate the presence of U.S. military forces in the Islamic world and terminate support for the existence of Israel.

40.     In furtherance of his goals, *AQI* wreaked havok in Iraq.  In order to perform his tasks, he relied upon *al-Qaeda* affilites to coordinate the movement of people, money and supplies into and throughout Iraq.

41.     Outside of Iraq, Zarqawi, with the financial support of *al-Qeada* and other terrorist financiers: attempted to blow up the Radisson SAS hotel in Amman in 1999; killed Lawrence Foley, a senior U.S. diplomat working for the United States Agency for International Development in Jordan, outside his home in Amman in 2002; attempted to use chemical weapons at the U.S. Embassy, the Jordanian Prime Minister's office and the headquarters of Jordanian intelligence, in Amman, Jordan in 2004; and, as detailed above, killed sixty people and injured hundreds in suicide bombings of three hotels in Amman in 2005.

42.     Each of these *AQI* terrorist attacks were funded by terrorist supporters utilizing the Defendants' HSBC banks.

## STANDARDS APPLICABLE TO FINANCIAL INSTITUTIONS

43.     The operations of financial institutions are governed by international, domestic, and industry standards.

44.     In 1988, the Basel Committee, an international standards organization that formulates broad supervisory standards and guidelines and recommends statements of best banking practices stated the following principles:

Banks' management should ensure that business is conducted in conformity with high ethical standards and that laws and regulations pertaining to financial transactions are adhered to.

Banks should not set out to offer services or provide active assistance in transactions which they have good reason to suppose are associated with money-laundering activities.

Banks should cooperate fully with national law enforcement authorities to the extent permitted by specific local regulations relating to customer confidentiality. Care should be taken to avoid providing support or assistance to customers seeking to deceive law enforcement agencies through the provision of altered, incomplete or misleading information.

Where banks become aware of facts which lead to the reasonable presumption that money held on deposit derives from criminal activity or that transactions entered into are themselves criminal in purpose, appropriate measures, consistent with the law, should be taken, for example, to deny assistance, sever relations with the customer and close or freeze accounts.[2]

45.     The statutory and regulatory duties incumbent upon financial institutions operating in the United States are set out in the Bank Secrecy Act ("BSA")[3] and the regulations appertaining thereto.  Other applicable industry standards support and clarify the duties of financial institutions.

46.     The BSA and the BSA regulations that the Department of Treasury ("Treasury") has issued apply to all financial institutions and specifically apply to banks. A principle purpose of the BSA is to require financial institutions to maintain appropriate records and file certain reports which are particularly useful in investigating and uncovering money laundering, drug activities, terrorism and other illegal activities.

---

[2] Basel Committee, Prevention of Criminal Use of the Banking System for the Purpose of Money-Laundering, Statement of Principles (December 1988), reprinted in BSA Manual, Section 1501.0 (September 1977), at 3-4.

[3] Titles I and II of Public Law 91-508, Oct. 26, 1970, as amended, codified at 12 U.S.C. 1829b, 12 U.S.C. 1951-1959, and 31 U.S.C. 5311 et seq; Money Laundering Control Act (1986), 18 U.S.C. 1956; The Money Laundering Prosecution Improvements Act, 31 U.S.C. 5312, 5321; The Annunzio-Wylie Anti-Money Laundering Act (1992) (Pub.L. 102-550, Title XV, Oct. 28, 1992, 106 Stat. 4044), 31 U.S.C. 5318(h); The Money Laundering and Financial Crimes Strategy Act (1998), 31 U.S.C. 5341(b) and 5342(b).

47.    The BSA requires financial institutions operating in the United States, and their directors, to undertake a number of anti-money laundering ("AML") efforts to ensure that financial institutions do not become conduits for terrorist financing or criminal proceeds, or facilitators of money laundering.  Key provisions require financial institutions and their directors to establish AML programs that include explicit written policies and procedures which are approved by the banks directors with a notation of such approval in the minutes of the directors' meetings, to designate a qualified bank employee as the BSA compliance officer with day-to-day responsibility for all aspects of the compliance program, to train employees, to establish an internal audit function, to verify the identity of persons seeking to open and maintain accounts (often termed "Know Your Customer" requirements), and to file reports identifying suspicious activities and currency transactions greater than US$10,000 to guard against money laundering.

48.    In addition to the BSA requiring financial institutions to implement AML procedures, international standards applicable to the financial services industry would similarly require implementation and enforcement of AML procedures. To the extent that the United States has accepted membership or agreed to implement standards or principles of any organization promulgating such standards or principles, the standards or principles are requirements for financial institutions to conduct business in the United States.

49.    One example of such international standards comes from the Financial Action Task Force ("FATF"). The FATF is an intergovernmental body originally established by the 1989 Paris G-7 Summit to develop and promote standards and policies to combat money-laundering. The FATF includes 31 countries and two international organizations, including the major financial center countries of Europe, North America and Asia.

11

50.     In April 1990, and updated in 1996 and 2003, the FATF issued a set of Forty

Recommendations that established a minimum for international AML standards and that has

been endorsed by more than 130 countries. In October 2001, the FATF dealt specifically with

terrorist financing by establishing a set of Eight Special Recommendations on Terrorist

Financing, complementary to the Forty Recommendations. In particular, SR IV recommends

that banks that "suspect or have reasonable grounds to suspect that funds are linked or related to,

or are to be used for terrorism, terrorist acts or by terrorist organisations," are required to report

their suspicions to the proper authorities. The FATF Forty and the Eight Special

Recommendations have been recognized by the International Monetary Fund and the World

Bank as the international standards for combating money laundering and the financing of

terrorism.

51.     Among the FATF's 40 Recommendations regarding AML laws is Recommendation

15, Recommending the following:

> Financial institutions should develop programmes against money laundering and
> terrorist financing. These programmes should include:
>
> (a) the development of internal policies, procedures and controls, including
> appropriate compliance management arrangements, and adequate screening
> procedures to ensure high standards when hiring employees;
> (b) an ongoing employee training programme...

52.     Financial institutions must ensure that appropriate bank personnel are trained in

all aspects of the regulatory requirements of the BSA and the banks internal BSA compliance

and AML policies and procedures. According to the Bank Secrecy Act/Anti-Money Laundering

Comptroller's Handbook, September 2000, at 6-7, an effective training program includes

provisions to ensure that:

All bank personnel, including senior management, who have contact with customers (whether in person or by phone), who see customer transaction activity, or who handle cash in any way, receive appropriate training. Those employees include persons involved with branch administration; customer service; lending; private, or personal banking; correspondent banking (international and domestic); trust; discount brokerage; funds transfers; safe deposit/custody; and vault activities.

Training is ongoing and incorporates current developments and changes to the BSA, anti-money laundering laws, and OCC and FinCEN regulations. New and different money laundering schemes involving customers and financial institutions should be addressed. It also should include examples of money laundering schemes and cases, tailored to the audience, and in ways in which such activities can be detected or resolved.

Training focuses on the consequences of an employee's failure to comply with established policy and procedures (e.g., fines or termination). Programs should provide personnel with guidance and direction in terms of banking policies and available resources.

53.    Due Diligence is necessary when opening and maintaining accounts. According to the Wolfsberg AML principles[4], global anti-money laundering standards and guidelines established by the world's largest banks, a "bank will endeavor to accept only those clients whose source of wealth and funds can be reasonably established to be legitimate… Mere fulfillment of internal review procedures does not relieve the private banker of this basic responsibility."

---

[4] The Wolfsberg Group is an association of large global banks that came together n 2000, at the Chateau Wolfsberg in north-eastern Switzerland, which agreed to a set of global anti money-laundering guidelines for international private banks. The banks initailly involved included ABN AMRO Bank, Barclays Bank, Banco Santander Central Hispano, S.A., The Chase Manhattan Private Bank, Citibank, N.A., Credit Suisse Group, Deutsche Bank AG, HSBC, J.P. Morgan, Societe Generale, and UBS AG. The Group's purpose is to develop financial services industry standards for Know Your Customer, Anti-Money Laundering and Counter Terrorist Financing Policies. The Wolfsberg Anti-Money Laundering Principles for Private Banking were published in October 2000 (and revised in May 2002). In January 2002, the Group published a Statement on the Financing of Terrorism and, in November 2002, released the Wolfsberg Anti-Money Laundering Principles for  Correspondent Banking. The Wolfsberg Group's most recent Statement, on Monitoring Screening and Searching, was published in September 2003. The standards are widely known.

54.     The Wolfsberg AML principles require that, for all accounts, the bank must exercise the following due diligence principles to identify the principle beneficial owners of an account:

> Natural persons: when the account is in the name of an individual, the private banker must establish whether the client is acting on his/her own behalf. If doubt exists, the bank will establish the capacity in which and on whose behalf the account holder is acting.
>
> Legal entities: where the client is a company, such as a private investment company, the private banker will understand the structure of the company sufficiently to determine the provider of funds, principal owner(s) of the shares and those who have control over the funds, e.g. the directors and those with the power to give direction to the directors of the company. With regard to other shareholders the private banker will make a reasonable judgment as to the need for further due diligence.
>
> Unincorporated associations: the above principles apply to unincorporated associations.

55.     To meet the due diligence standards established by the Wolfsberg AML principles, banks should meet the client before opening the account and must collect and record the following information about each account: Purpose and reasons for opening the account; Anticipated account activity; Source of wealth (description of the economic activity which has generated the net worth); Estimated net worth; Source of funds (description of the origin and the means of transfer for monies that are accepted for the account opening); and References or other sources to corroborate reputation information where available.

56.     The FATF warns that mere financial accounting and auditing might be insufficient protection against the abuse. "Direct field audits of programmes may be, in some instances, the only method for detecting misdirection of funds. Examination of field operations is clearly a superior mechanism for discovering malfeasance of all kinds, including diversion of

funds to terrorists." FATF Task Force on Money Laundering, Combating the Abuse of Non-Profit Organisations," at ¶ 11, p. 3 (October 11, 2002).

57.     Non-profit Organizations, particularly those held out as charitable organizations, constitute high-risk accounts warranting enhanced due diligence and scrutiny, because the mechanism of charitable fundraising has, "in numerous instances … been used to provide a cover for the financing of terror." FATF on Money Laundering, "Combating the Abuse of Non-Profit Organisations: International Best Practices," at ¶ 4, p. 1 (October 11, 2002).

58.     Although "[j]urisdictions may differ on the scope of purposes and activities that are within the definition of 'charity,' … all should agree that ['charity'] does not include activities that directly or indirectly support terrorism, including actions that could serve to induce or compensate for participation in terrorist acts." FATF, "Combating the Abuse of Non-Profit Organisations: International Best Practices," at ¶ 5, p. 2 (October 11, 2002).

59.     The misuse of non-profit organizations for the financing of terrorism has been a crucial weak point in the global struggle to stop such funding at its source. This issue has captured the attention of the Financial Action Task Force (FATF), the G7, and the United Nations, as well as national authorities in many regions. FATF on Money Laundering, "Combating the Abuse of Non-Profit Organisations: International Best Practices," at ¶ 1, p. 1 (October 11, 2002).

60.     The FATF recognizes that the importance of requiring charitable fund-raising and transfer of funds to go through formal or registered channels underscores the benefit of enlisting the established powers of the bank regulatory system – suspicious activity reporting, know-your-customer (KYC) rules, etc – in the fight against terrorist abuse or exploitation of non-profit

organisations. FATF on Money Laundering, "Combating the Abuse of Non-Profit

Organisations: International Best Practices," at ¶ 21, p. 5 (October 11, 2002).

61.     Enforcement is required. Pursuant to the Bank Secrecy Act, 31 U.S.C. §§ 5311

to 5324, the Secretary of the Treasury has prescribed regulations governing financial institutions'

obligations to report certain currency transactions. 31 U.S.C. § 5313. In prescribed

circumstances, financial institutions, including the defendants, must file Suspicious Activity

Reports (Treasury Department Form 90-22.47), pursuant to section (a) of 31 CFR § 103.18

(Treasury), 12 CFR 21.11 (OCC), 12 CFR §§ 208.60 and 208.62 (Federal Reserve), 12 CFR §§

353.1 and 351.3 (FDIC) and 12 CFR § 563.180 (OTS) and Currency Transaction Reports (IRS

Form 4789), pursuant to 31 CFR § 103.22.

62.     Banks must have a written policy on the identification of and follow-up on unusual or

suspicious activities. Some examples of unusual or suspicious activities may include:

> Account transactions or other activities which are not consistent with the
> customer's business or the account's due diligence file;

> Cash transactions over a certain amount;

> Account transactions or other activities that seek to avoid reporting or record
> keeping requirements;

> Wire, pass-through, and in-and-out transactions

63.     Following the September 11th attacks on the United States, far greater terrorist

financing legislation was enacted. As President Bush stated "[w]e put the world's financial

institutions on notice: if you do business with terrorists, if you support them or sponsor them, you will not do business in the United States of America."[5]

### HSBC's CONDUCT

64.     During hearings in 1990 regarding the then-pending Antiterrorism Act of 1990, Joseph A. Morris, a former Department of Justice Attorney and former General Counsel of the United States Information Agency testified:

> International terrorism has become, in many respects, an industry. It rests on a foundation of money. Money is often more important to the masters of terrorism than are people. That they care little for their victims goes without saying; but it is instructive of many terrorist organizations appear to care little for their own operatives, treating them as fungible and dependable.

65.     Accordingly, the United States has devoted significant resources to stopping some of the most dangerous persons and jurisdictions threatening the world today from utilizing the U.S. financial system.

66.     To implement the law and the international standards applicable to financial institutions, the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) developed a list of prohibited persons and countries which banks use to create an "OFAC filter" to identify and halt potentially prohibited transactions.

67.     Because the OFAC filter can delay or block transactions, HSBC affiliates used tactics to circumvent it so that they could continue doing business with prohibited persons and financial institutions that were known to be associated with terrorist financing.

---

[5] Remarks of President George W. Bush in his address to the Financial Crime Enforcement Network in Vienna, Va., Nov., 7, 2001

68.     Common tactics included stripping information from wire transfer documentation to conceal the participation of a prohibited country or person, or characterizing a transaction as a transfer between banks in an approved jurisdiction, while omitting underlying payment details that would disclose participation of a prohibited originator or beneficiary.

69.     For example, unlawful funds transfers from HSBC-Middle East were sent through HSBC Groups U.S. correspondent accounts at HSBC-US by:

> Deleting references to prohibited persons or institutions from the payment instructions (a/k/a "stripping" the transactions) or otherwise altering the messages to either omit or falsify information that would have otherwise indicated the prohibited person's or institution's involvement in the transaction; and

> Styling the transaction as a bank-to-bank "cover" transaction between two, non-prohibited banks, solely because the MT 202 payment message format used for such transactions did not expressly obligate HSBC to identify the transaction's originator and beneficiary, thus avoiding any disclosure of the transaction's prohibited connections, and blocking HSBC-US's electronic OFAC filters from recognizing the transaction.

70.     By circumventing OFAC regulations, HSBC had the ability to engage in business and financial transactions with prohibited persons or corporations, including those associated with terrorist financing.

71.     The affiliates' use of these practices was brought to the attention of HSBC Group Compliance by HBUS personnel and by HBEU personnel.

72.      Despite this information, HSBC Group Compliance did not take decisive action to stop the conduct or inform HBUS of the extent of the activity.  Instead, HSBC defendants continued to undertake various methods to facilitate payments to prohibited persons or institutions that would evade U.S. sanctions.

73.    From 2002-2007, some HSBC affiliates sent potentially prohibited transaction through HBUS involving Burma, Cuba, North Korea, Sudan, and other prohibited countries or persons.

74.    An outside auditor hired by HBUS has so far identified that from 2001-2007, more than 28,000 undisclosed, OFAC sensitive transactions were sent through HBUS – these transactions amounted to 19.7 billion dollars.

75.    For decades, HSBC has been one of the most active global banks in the Middle East, Asia, and Africa despite being aware of the terrorist financing risks in those regions.

76.    In particular, HSBC has been active in Saudi Arabia, conducting substantial banking activity through affiliates, as well as conducting business with Saudi Arabia's largest private financial institution– Al Rajhi Bank.

77.    HSBC provided Al Rajhi Bank with a wide range of banking services including U.S. Dollars, wire transfers, foreign exchange, trade financing, and asset management services.

78.    In 2001, evidence began to emerge that Al Rajhi Bank and some of its owners had links to financing organizations associated with terrorist, including evidence that the bank's key founder was an important benefactor of *al-Qaeda*.

79.    In 2003, the CIA reported that Al Rajhi Bank was, indeed, associated with terrorist financing.

80.    HSBC knew of the evidence indicating that Al Rajhi Bank was associated with terrorist financing.  In fact, in 2005, HSBC announced internally that they should cut all ties with Al Rajhi Bank.  Despite their concerns, however, HSBC reversed itself four months later and allowed each affiliate to choose for themselves whether or not to continue doing business with Al Rajhi Bank.

81.     Despite ongoing troubling information regarding Al Rajhi Bank's connection to terrorist financing, HSBC provided nearly $1 billion in U.S. dollars to Al Rajhi Bank.

82.     This dollar denominator activity with Al Rajhi Bank provided *al-Qaeda* and *AQI* exactly what they so desperately desired - U.S. Dollars to finance their attacks on U.S. targets.

83.      HSBC  knew or should have known that the funds deposited in the accounts established and maintained by it, or otherwise belonging to, disbursed by or under the control of it, were used to support, encourage, entice and make possible these suicide bombings in that both HSBC established, maintained and administered a highly organized program to make financial payments to the terrorist groups *al-Qaeda* and *AQI* possible.

## AL RAJHI BANK's CONDUCT

84.     Al Rajhi Bank maintained accounts for terrorists and supporters of extremist organizations such as *al-Qaeda* and *AQI*.

85.     Al Rajhi Bank maintained accounts for many of *al-Qaeda's* charity fronts, including the IIRO, MWL, WAMY, BIF and Al Haramain, among others.

86.     In cooperation with these charitable organizations, Al Rajhi Bank advertised the existence and numerical designation of the accounts it maintained for those charities throughout the Muslim world, thereby providing a mechanism to allow *al-Qaeda* and *AQI's* supporters to deposit funds directly into those accounts.

87.     Al Rajhi Bank was expressly aware that many of the charities for which Al Rajhi Bank provided financial services were conduits for financing *al-Qaeda* and *AQI*, and that the Bank was being used as a vehicle for laundering funds on behalf of, and transferring funds to that terrorist organization.

88.     Despite this knowledge, Al Rajhi Bank has continued to maintain those accounts and to directly fund the charities.

89.     A 2003 Report from the United States Central Intelligence Agency classified Al Rajhi Bank as a conduit for extreme terrorist financing, stating:

> Islamic extremists have used Al Rajhi Banking & Investment Corporation since at least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound. Senior Al Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank. Reporting indicates that senior Al Rajhi family members control the bank's most important decisions. The Al Rajhis know they are under scrutiny and have moved to conceal their activities from financial regulatory authorities

90.     Additionally, a report published in the Wall Street Journal in 2007 noted that United States intelligence reports describe how Al Rajhi Bank has maintained accounts and accepted donations for Saudi charities that the U.S. and other nations have formally designated as fronts for *al-Qaeda* or other terrorist groups.[6]

91.     Al Rajhi Bank was one of the multiple banks and donors that supplied financial support to the central leadership in *al-Qaeda*.

92.     The main leadership provided considerable financial support to *AQI*'s Jordanian-born leader, Zarqawi specifically, and *AQI*, generally.

93.     Al Rajhi Bank knew or should have known that the funds deposited in the accounts established and maintained by it, or otherwise belonging to, disbursed by or under the control of it, were used to support, encourage, entice and make possible these suicide bombings in that both

---

[6] *U.S. Track Saudi Bank Favored By Extremists*, By: Glenn Simpson. Wall Street Journal,  July 26, 2007.

Al Rajhi Bank established, maintained and administered a highly organized program to make

financial payments to the terrorist groups *al-Qaeda* and *AQI* possible.

### COUNT I: HSBC's CIVIL LIABILITY UNDER  18 U.S.C. § 2333

Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

94.     The Anti-Terrorism Act of 1990 imposes liability at any point along the causal chain

of terrorism that would interrupt, or at least imperil, the flow of money. S. Rep. 102-342 at, 22

(1992).

95.     HSBC was under a heightened duty as a fiduciary of banks and charities, and as a

public servant endowed with the public's trust. That duty involved conducting itself in conformity

with high ethical standards, complying with the laws and regulations applicable to the industry,

avoiding the use of the bank's services for illegal purposes, and cooperating fully and

appropriately with law enforcement authorities.

96.     HSBC was under a general duty to implement and enforce due diligence methods to

prevent its banks from being used to intentionally injure, maim or kill, commit criminal or

tortuous acts, endanger lives, and engage in activity that would foreseeable lead to the personal

injury and/or death of the plaintiffs.

97.     HSBC breached these duties by:

    a)  Failing to ensure that business is conducted in conformity with high ethical standards and that laws and regulations pertaining to financial transactions are adhered to;

    b)   Offering services or providing active assistance in transactions which they have good reason to suppose are associated with money-laundering activities and/or terrorist financing;

22

c)  Failing to cooperate fully with national law enforcement authorities to the extent permitted by specific local regulations relating to customer confidentiality;

d)  Failing to take appropriate care to avoid providing support or assistance to customers seeking to deceive law enforcement agencies through the provision of altered, incomplete or misleading information;

e)  Failing to report suspicious activities to the proper authorities;

f)  Failing to sever relations and close or freeze accounts with customers who were suspected of money-laundering or terrorist financing;

g)  Failing to exercise due diligence in ensuring that their financial institutions do not become conduits for terrorist financing;

h)  Failing to implement and/or enforce procedures that would implement international standards applicable to anti-money laundering efforts;

i)  Failing to adhere to Know Your Customers standards;

j)  Failing to exercise due diligence and heightened scrutiny to accounts held out as a mechanism for fundraising  charitable organizations;

k)  Engaging in business and financial transaction with Al Rajhi Bank–a bank known to finance terrorist groups; and

l)  Actively circumventing OFAC regulations and violating anti-money laundering efforts prescribed by law.

98.     HSBC'S breaches of these duties were a proximate cause of the deaths and

personal injuries inflicted on the victims of the November 9, 2005 suicide bombings in Amman,

Jordan, and specifically, Plaintiffs and Plaintiffs' Decedents.

WHEREFORE, plaintiffs, JEFFREY SIEGEL, Administrator of the Estate of

MOUSTAPHA AKKAD, deceased, and MOUSTAPHA AKKAD's heirs; SOOHA AKKAD,

individually; SUSAN GITELSON, Special Administrator of the Estate of RIMA AKKAD

MONLA, deceased, and RIMA AKKAD MONLA's heirs, ZIAD MONLA, individually, and on

behalf of his minor sons; and MICHAEL BUTLER, demand judgment against defendants, HSBC

HOLDINGS, PLC ("HSBC-HOLDINGS"); HSBC NORTH AMERICA HOLDINGS INC.

("HSBC N.A. HOLDINGS"); HSBC BANK USA, N.A. ("HSBC BANK-USA"); HSBC

SECURITIES (USA) INC.; HSBC FINANCE CORPORATION; HSBC USA INC. ("HSBC-

USA"); HSBC BANK MIDDLE EAST LIMITED ("HSBC MIDDLE EAST"), for a sum in

excess of the jurisdictional limits to bring this lawsuit in the United States District Court of the

Northern District of Illinois, including treble damages pursuant to 18 U.S.C. § 2333, together with

costs, attorneys fees and interest.

## COUNT II: CIVIL LIABILITY UNDER  18 U.S.C. § 2333

Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

99.    Al Rajhi Bank was under a heightened duty as a fiduciary of banks and charities, and as a public servant endowed with the public's trust. That duty involved conducting itself in conformity with high ethical standards, complying with the laws and regulations applicable to the industry, avoiding the use of the bank's services for illegal purposes, and cooperating fully and appropriately with law enforcement authorities.

100.    Al Rajhi Bank was under a general duty to implement and enforce due diligence methods to prevent its banks from being used to intentionally injure, maim or kill, commit criminal or tortuous acts, endanger lives, and engage in activity that would foreseeable lead to the personal injury and/or death of the plaintiffs.

24

101.   Al Rajhi Bank breached these duties by:

a)   Failing to ensure that business is conducted in conformity with high ethical standards and that laws and regulations pertaining to financial transactions are adhered to;

b)   Offering services or providing active assistance in transactions which they have good reason to suppose are associated with money-laundering activities and/or terrorist financing;

c)   Failing to cooperate fully with national law enforcement authorities to the extent permitted by specific local regulations relating to customer confidentiality;

d)   Failing to take appropriate care to avoid providing support or assistance to customers seeking to deceive law enforcement agencies through the provision of altered, incomplete or misleading information;

e)   Failing to report suspicious activities to the proper authorities;

f)   Failing to sever relations and close or freeze accounts with customers who were suspected of money-laundering or terrorist financing;

g)   Failing to exercise due diligence in ensuring that their financial institutions do not become conduits for terrorist financing;

h)   Failing to implement and/or enforce procedures that would implement international standards applicable to anti-money laundering efforts;

i)   Failing to adhere to Know Your Customers standards;

j)   Failing to exercise due diligence and heightened scrutiny to accounts held out as a mechanism for fundraising  charitable organizations; and

k)   Engaging in financial and business transaction with customers who are known to provide financial support to *al-Qaeda and AQI*.

102.   Al Rajhi Bank's breaches of these duties were a proximate cause of the deaths and personal injuries inflicted on the victims of the November 9, 2005 suicide bombings in Amman, Jordan, and specifically, Plaintiffs and Plaintiffs' Decedents.

WHEREFORE, plaintiffs, JEFFREY SIEGEL, Administrator of the Estate of MOUSTAPHA

AKKAD, deceased, and MOUSTAPHA AKKAD's heirs; SOOHA AKKAD, individually;

SUSAN GITELSON, Special Administrator of the Estate of RIMA AKKAD MONLA, deceased,

and RIMA AKKAD MONLA's heirs, ZIAD MONLA, individually, and on behalf of his minor

sons; and MICHAEL BUTLER, demand judgment against defendant, AL RAJHI BANK,  for a

sum in excess of the jurisdictional limits to bring this lawsuit in the United States District Court of

the Northern District of Illinois, including treble damages pursuant to 18 U.S.C. § 2333, together

with costs, attorneys fees and interest.


/s/ William T. Gibbs


William T. Gibbs
Corboy & Demetrio, P.C.
Attorney for Plaintiffs
33 North Dearborn Street, 21st Floor
Chicago, Illinois  60602
(312) 346-3191
Firm I.D. No. 108

26