#108    WTG\kah    3/13/2018                                                                    2007S-0284

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

JEFFREY SIEGEL, Administrator of the
Estate of MOUSTAPHA AKKAD, deceased,
and MOUSTAPHA AKKAD's heirs; SOOHA
AKKAD, individually; SUSAN GITELSON,
Special Administrator of the Estate of RIMA
AKKAD MONLA, deceased, and RIMA
AKKAD MONLA's heirs, ZIAD MONLA,
individually, and on behalf of his minor sons;
and MICHAEL BUTLER,                                     No. 1:17-cv-06593-DLC

     Plaintiffs,

      v.                              Honorable Denise L. Cote

HSBC BANK USA, N.A. ("HBUS") and
HSBC NORTH AMERICA HOLDINGS, INC.
("HSBC-NORTH AMERICA"),

     Defendants.                         **PLAINTIFFS DEMAND TRIAL BY JURY**

## THIRD AMENDED COMPLAINT AT LAW

Plaintiffs, JEFFREY SIEGEL, Administrator of the Estate of MOUSTAPHA AKKAD, deceased, and MOUSTAPHA AKKAD's heirs; SOOHA AKKAD, individually; SUSAN GITELSON, Special Administrator of the Estate of RIMA AKKAD MONLA, deceased, and RIMA AKKAD MONLA's heirs, ZIAD MONLA, individually, and on behalf of his minor sons; and MICHAEL BUTLER, by and through their attorneys, CORBOY & DEMETRIO, P.C., complaining of Defendants, HBUS and HSBC NORTH AMERICA state:

## NATURE OF THE ACTION

1.      "Money is the oxygen of terrorism - without the means to raise and move money around the world, terrorists cannot function," said Colin Powell.  This civil action is brought on behalf of nationals of the United States that are victims of a terrorist bombing that was accomplished with the aid of a number of financial institutions, pursuant to the Anti-Terrorism Act, 18 U.S.C. § 2331, 18 U.S.C. § 2333, 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, and 18 U.S.C. § 2339C.

2.      The causes of action arise out of HSBC's nearly ten year scheme to evade U.S. sanctions and provide material support to *al-Qaeda*[1] and *al-Qaeda in Iraq* ("*AQI*")[2], both designated Foreign Terrorist Organizations (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")).

3.      On November 4, 2005, *AQI* and its leader, Abu Musab al-Zarqawi ("Zarqawi"), sent four suicide bombers into Amman, Jordan.

---

[1] On October 8, 1999, *al-Qaeda* was officially designated by the United States as a Foreign Terrorist Organization.

[2] On December 17, 2004, *AQI* was officially designated by the United States as an Foreign Terrorist Organization.

4.      On November 9, 2005 (*i.e.*, 9/11/05 in the Arabic calendar) in Amman, Jordan, those *AQI* suicide bombers, wearing bomb belts packed with the powerful explosive RDX and ball bearings designed to inflict the maximum number of casualties, entered the lobbies of the Radisson SAS, the Days Inn, and the Grand Hyatt Amman - hotels Zarqawi and *AQI* purposely chose in order to "kill as many Americans and Israelis as possible." The suicide bombers detonated their bombs within minutes of one another, killing a total of fifty-seven civilians and wounding 110 others.

5.      In one of the hotels targeted by the *AQI* suicide bombers, the Grand Hyatt Amman, Plaintiff's Decedent, Moustapha Akkad and his daughter, Rima Akkad Monla, both nationals of the United States, were killed, and hundreds were injured, including Michael Butler and Sooha Akkad, also both nationals of the United States.

6.      The Amman Jordan Terrorist Attack of 9/11/05 was carried out by four suicide bombers using material support and resources provided and/or facilitated by HSBC's scheme to circumvent U.S. banking regulations in order to provide its customers with access to the U.S. financial system, including, but not limited to customers with ties to notorious terror groups, *al-Qaeda* and *AQI*.

7.      For international operations such as the Jordanian bombing, *AQI* relied upon funding from Osama bin Laden's central *al-Qaeda* operation and fundraising, and movement of funds, outside of Iraq.

8.      Specifically, for over a year (i.e., since at least November, 2004) leading up to the attacks, *AQI* (from its operational base in Iraq) was planning the Jordanian attacks by selecting targets with ties to the United States, recruiting and training the bombers to carry out the attacks,

3

constructing the bombs, and smuggling the bombers into Jordan by utilizing funds and funding obtained through terrorist financing groups by way of the Defendants' financial institutions.

9.      The Defendants were aware that they were supporting, and that they were aiding and abetting, foreign terrorist organizations responsible for international acts of terror through their continued banking activities. Indeed, but for the Defendants' willingness to facilitate terrorist financing, *AQI* could not have planned or performed the heinous attacks in Jordan that targeted U.S. nationals and resulted in injury and death to Plaintiffs and Plaintiffs' decedents.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this matter and over the defendants pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2333(a). Venue is appropriate pursuant to 18 U.S.C. § 2334(a), 28 U.S.C. 1391(b)(2) and 28 U.S.C. 1391(c)(3).

11.     Defendants are subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2334(a), and Fed. R. Civ. P. 4(k). Defendants' unlawful conduct occurred both inside and was purposefully directed at the United States. The scheme created by the Defendants was specifically designed to effectuate the flow of billions of U.S. dollars through the United States in violation of U.S. laws, and, in fact, resulted in nearly a billion dollars illegally passing through the United States.

## THE PARTIES

### Moustapha Akkad

12.     Plaintiff, Jeffery Siegel, a resident of California, brings this action on behalf of the Estate of Moustapha Akkad as its Administrator. Additionally, Mr. Akkad's heirs, Sooha Akkad, Tarek Akkad, Malek Akkad, and Zade Akkad, all Plaintiffs herein, are all U.S. citizens.

4

13.     On November 9, 2005, Moustapha Akkad, a national of the United States, was a registered guest at the Grand Hyatt Amman and was located in the lobby of said hotel when a suicide bomber detonated the explosives.

14.     As a proximate result, Moustapha Akkad sustained injuries of personal and pecuniary nature that resulted in his death on November 11, 2005.

15.     Moustapha Akkad, a national of the United States, left surviving him Sooha Akkad, his wife, and his three sons, Tarek Akkad, Malek Akkad and Zade Akkad, each of whom has experienced grief and sorrow as well as the loss of love, affection, care, attention, companionship, comfort, guidance, protection, and financial support due to the death of Moustapha Akkad.

**Sooha Akkad**

16.     Plaintiff, Sooha Akkad, a national of the United States and a resident of California, brings this action individually.

17.     On November 9, 2005, Sooha Akkad was a registered guest at the Grand Hyatt Amman and was located in the lobby of said hotel when the *AQI* bomber detonated his explosives.

18.     As a proximate result, Sooha Akkad, a national of the United States, sustained injuries of personal and pecuniary nature.

**Rima Akkad Monla**

19.     Plaintiff, Susan Gitelson, an Illinois resident, Special Administrator of the Estate of Rima Akkad Monla, brings this action on behalf of Rima Akkad Monla's heirs, Ziad Monla and her two sons, Tarek Monla, a minor, and Moustapha Monla, a minor, each of whom has

experienced grief and sorrow as well as the loss of love, affection, care, attention, companionship, comfort, guidance, protection, and financial support due to the death of Rima Akkad Monla.

20.     Rima Akkad Monla, a national of the United States, was also a registered guest at the Grand Hyatt Amman and was located in the lobby of said hotel when the suicide bomber detonated his explosives.

21.     As a proximate result, Rima Akkad Monla sustained injuries of personal and pecuniary nature prior to her death on November 9, 2005.

22.     Rima Akkad Monla, a national of the United States, is survived by her husband, Ziad Monla and her two sons, Tarek Monla, a minor, and Moustapha Monla, a minor.  Ziad Monla, as an heir of Rima Akkad Monla, brings this action on his own behalf and on behalf of his minor sons.

**Michael Butler**

23.     Plaintiff, Michael Butler, a national of the United States and a resident of Massachusetts, brings this action individually.

24.     On November 9, 2005, Michael Butler was a registered guest at the Grand Hyatt Amman and was located in the lobby of said hotel when the suicide bomber detonated the explosives.

25.     As a proximate result, Michael Butler, a national of the United States, sustained injuries of personal and pecuniary nature.

**The Defendants**

26.     Defendant HSBC Bank USA, N.A. ("HBUS") is located in Mettawa, IL and

McLean, Virginia, with its principal office located in New York, NY.

27.     HSBC North America Holdings, Inc. ("HSBC-North America"), is a financial institution holding company organized under the laws of Delaware with its principal place of business in New York, NY. HSBC-North America is the parent-company of HBUS. HSBC-North America's officials, committee members, compliance officers, and Anti-Money Laundering ("AML") directors are involved with, and oversee, the compliance and AML operations at HBUS.

**OVERVIEW OF HSBC's VIOLATIONS OF THE ANTI-TERRORISM ACT**

28.     These Defendants were, at all relevant times leading up to the November 9, 2005 Jordanian hotel bombings, "offering a gateway for terrorists to gain access to U.S. dollars and the U.S. financial system," failing "to take reasonable steps to ensure it is not dealing with banks that may have links to or facilitate terrorist financing," "opening U.S. correspondent accounts for high risk affiliates without conducting due diligence," "facilitating transactions that hinder[ed] U.S. efforts to stop terrorists," "providing U.S. correspondent services to banks with links to terrorism,"[3] and otherwise aiding and abetting *AQI* and other terrorist organizations despite the knowledge that, through its financial support and resources, it was playing a role as part of an overall illegal and/or tortious activity.

29.     Zarqawi's financial and logistical network played a key role in the implementation of the Amman Hotel bombings, the attack on the Grand Hyatt Amman in particular. Indeed, the couple that ultimately bombed the Grand Hyatt Amman entered the Kingdom legally, under a

---

[3] *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing*: HSBC Case History; United States Senate Permanent Sub-Committee on Investigations; Majority and Minority Staff Report. July 17, 2010; pages 3-7, 238-239. (Available at http://www.hsgac.senate.gov/download/?id=2A76C00F-7C3A-44C8-902E-3D9B5DBD0083).

special Jordanian visa allowing them to seek fertility treatment at one of Jordan's fertility clinics. Insofar as money is fungible, the travel expenses, and the explosives for this operation, were underwritten by funds that moved through Al Rajhi Bank, via HSBC.

30.     Each individual attack, including the November 9, 2005 bombing in Amman, Jordan, was a great expense to *AQI.* When administrative costs, such as paying group members and the families of the imprisoned and deceased, securing and maintaining safe houses, and transporting material and members, were spread across the number of events, the cost of each attack was in the thousands of U.S. dollars. On average, a single attack cost *AQI* $2,700 U.S. dollars. This amount is equivalent to forty (40) percent of the average household income.

31.     The November 9, 2005 bombing in Amman perpetrated by *AQI* was funded by terrorist supporters utilizing Al Rajhi and HSBC banks to gain access to U.S. dollars and the U.S. financial system.

32.     For decades, the HSBC Defendants, despite being aware of the terrorist financing risks in the Middle East, and, in particular, Saudi Arabia, had been banking through various affiliates in the area and providing Saudi Arabia's largest private financial institution, Al Rajhi Bank, with access to the U.S. financial system.

33.     Al Rajhi Bank is Saudi Arabia's largest private bank, holding $80 billion in assets. Headquartered in Riyadh, Saudi Arabia, Al Rajhi Bank has over 500 branches–mostly in Saudi Arabia, but also in Malaysia, Kuwait, and Jordan.

34.     A 2003 Report from the United States Central Intelligence Agency classified Al Rajhi Bank as a conduit for extreme terrorist financing, stating:

Islamic extremists have used Al Rajhi Banking & Investment Corporation since at

8

least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound. Senior Al Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank. Reporting indicates that senior Al Rajhi family members control the bank's most important decisions. The Al Rajhis know they are under scrutiny and have moved to conceal their activities from financial regulatory authorities.

35.     At all relevant times leading up to the tragic bombing on November 9, 2005, the

HSBC Defendants knew that Al Rajhi Bank and its owners were associated with terrorist

financing – specifically:

- in 2002, the name of the bank's most senior official, Sulaiman bin Abdul Azis Al Rajhi appeared on a list of twenty 'Golden Chain' wealthy investors who supported *al-Qaeda*;

- a 2003 report by the Central Intelligence Agency referred to the bank as a "Conduit for Extremist Finance";

- a U.S. indictment in February 2005 charged two individuals with cashing $130,000 in U.S. travelers checks at Al Rajhi Bank in Saudi Arabia and smuggling the money to violent extremists in Chechnya;

- the U.S. Treasury Under Secretary for Terrorism and Financial Intelligence, in July of 2005, had testified that "Saudi donors may still be a significant source of terrorist financing, including the insurgency in Iraq"; and

- since as early as 2001, HSBC knew that individuals and entities that had been designated as terrorist organizations were clients of Al Rajhi Bank .

36.     At all relevant times, since as early as 2001, the HSBC Defendants knew that Al

Rajhi Bank and its owners provided accounts to clients linked with terrorism (to wit, the *al-*

*Haramain Islamic Foundation* and *Soliman Al-Buthe*, both designated by the U.S. as linked to

terrorism, and the *International Islamic Relief Organization* which is known for "facilitating

fundraising for *al- Qaeda*"), and provided crucial material support to *AQI* and Zarqawi.

37.     At all relevant times, the relationship between Al Rajhi Bank and *AQI* was simple.

9

The HSBC Defendants knew that Jihadists knew they could trust sharia-compliant banks to maintain their anonymity, not ask too many questions, and facilitate high-dollar transactions on behalf of their terrorist groups.

38.     Leading up to the November 9, 2005 bombing, from their locations inside the United States, HBUS provided correspondent banking and banknotes accounts to Al Rajhi Bank. HSBC-North America personnel were aware of, supported, and encouraged HBUS to provide U.S. correspondent banking and banknotes accounts to Al Rajhi Bank, despite their knowledge of Al Rajhi's connections to al Qaeda and *AQI*.

39.     Additionally, Al Rajhi Bank provided banking services directly to *AQI* and Zarqawi. By continuing to do business with Al Rajhi Bank even when it knew of the connections to terrorist organizations, HSBC allowed *AQI* and Zarqawi the access to the U.S. financial system they needed to carry out their acts of terror, including the November 5, 2009 bombing in Amman.

40.     The funds that came from HSBC and were subsequently deposited in the accounts established and maintained, or otherwise belonging to, disbursed by, or under the control of Al Rajhi Bank, were used to support, encourage, entice and make possible the November 9, 2005 bombing in Amman because of a highly organized program to make financial payments to the terrorist groups *al-Qaeda* and *AQI* possible.

41.     Without the Defendants, *AQI* and Zarqawi would not have had the access to the United States financial system required to carry the November 5, 2009 bombing in Amman. HSBC's knowing support of Al Rajhi Bank, and Al Rajhi Bank's support of *AQI* and Zarqawi, led to the deaths and injuries of hundreds of Americans in Amman, and bolstered a

terrorist network that killed and injured hundreds, including Plaintiffs and Plaintiffs' decedents on November 9, 2005.

## <u>STANDARDS APPLICABLE TO FINANCIAL INSTITUTIONS</u>

42.     The operations of financial institutions are governed by international, domestic, and industry standards.

43.     In 1988, the Basel Committee, an international standards organization that formulates broad supervisory standards and guidelines and recommends statements of best banking practices stated the following principles:

> Banks' management should ensure that business is conducted in conformity with high ethical standards and that laws and regulations pertaining to financial transactions are adhered to.
>
> Banks should not set out to offer services or provide active assistance in transactions which they have good reason to suppose are associated with money-laundering activities.
>
> Banks should cooperate fully with national law enforcement authorities to the extent permitted by specific local regulations relating to customer confidentiality. Care should be taken to avoid providing support or assistance to customers seeking to deceive law enforcement agencies through the provision of altered, incomplete or misleading information.
>
> Where banks become aware of facts which lead to the reasonable presumption that money held on deposit derives from criminal activity or that transactions entered into are themselves criminal in purpose, appropriate measures, consistent with the law, should be taken, for example, to deny assistance, sever relations with the customer and close or freeze accounts.[4]

44.     The statutory and regulatory duties incumbent upon financial institutions

---

[4] Basel Committee, Prevention of Criminal Use of the Banking System for the Purpose of Money-Laundering, Statement of Principles (December 1988), reprinted in BSA Manual, Section 1501.0 (September 1977), at 3-4.

operating in the United States are set out in the Bank Secrecy Act ("BSA")[5] and the regulations

appertaining thereto.  Other applicable industry standards support and clarify the duties of

financial institutions.

45.     The BSA and the BSA regulations that the Department of Treasury ("Treasury")

issued apply to all financial institutions and specifically apply to banks. A principle purpose

of the BSA is to require financial institutions to maintain appropriate records and file certain

reports which are particularly useful in investigating and uncovering money laundering, drug

activities, terrorism and other illegal activities.

46.     The BSA requires financial institutions operating in the United States, and their

directors, to undertake a number of anti-money laundering ("AML") efforts to ensure that

financial institutions do not become conduits for terrorist financing or criminal proceeds, or

facilitators of money laundering.  Key provisions require financial institutions and their directors

to establish AML programs that include explicit written policies and procedures which are

approved by the banks directors with a notation of such approval in the minutes of the directors'

meetings, to designate a qualified bank employee as the BSA compliance officer with day-to-day

responsibility for all aspects of the compliance program, to train employees, to establish an

internal audit function, to verify the identity of persons seeking to open and maintain accounts

(often termed "Know Your Customer" requirements), and to file reports identifying suspicious

activities and currency transactions greater than U.S. $10,000 to guard against money laundering.

---

[5] Titles I and II of Public Law 91-508, Oct. 26, 1970, as amended, codified at 12 U.S.C. 1829b, 12 U.S.C. 1951-1959, and 31 U.S.C. 5311 et seq; Money Laundering Control Act (1986), 18 U.S.C. 1956; The Money Laundering Prosecution Improvements Act, 31 U.S.C. 5312, 5321; The Annunzio-Wylie Anti-Money Laundering Act (1992) (Pub.L. 102-550, Title XV, Oct. 28, 1992, 106 Stat. 4044), 31 U.S.C. 5318(h); The Money Laundering and Financial Crimes Strategy Act (1998), 31 U.S.C. 5341(b) and 5342(b).

47.     In addition to the BSA requiring financial institutions to implement AML procedures, international standards applicable to the financial services industry would similarly require implementation and enforcement of AML procedures. To the extent that the United States has accepted membership or agreed to implement standards or principles of any organization promulgating such standards or principles, the standards or principles are requirements for financial institutions to conduct business in the United States.

48.     One example of such international standards comes from the Financial Action Task Force ("FATF"). The FATF is an intergovernmental body originally established by the 1989 Paris G-7 Summit to develop and promote standards and policies to combat money-laundering. The FATF includes 31 countries and two international organizations, including the major financial center countries of Europe, North America and Asia.

49.     In April 1990, and updated in 1996 and 2003, the FATF issued a set of Forty Recommendations that established a minimum for international AML standards and that has been endorsed by more than 130 countries. In October 2001, the FATF dealt specifically with terrorist financing by establishing a set of Eight Special Recommendations on Terrorist Financing, complementary to the Forty Recommendations. In particular, SR IV recommends that banks that "suspect or have reasonable grounds to suspect that funds are linked or related to, or are to be used for terrorism, terrorist acts or by terrorist organizations," are required to report their suspicions to the proper authorities. The FATF Forty and the Eight Special Recommendations have been recognized by the International Monetary Fund and the World Bank as the international standards for combating money laundering and the financing of terrorism.

13

50.     Among the FATF's 40 Recommendations regarding AML laws is

Recommendation 15, Recommending the following:

> Financial institutions should develop programmes against money laundering and terrorist financing. These programmes should include:
>
> > (a) the development of internal policies, procedures and controls, including appropriate compliance management arrangements, and adequate screening procedures to ensure high standards when hiring employees;
> > (b) an ongoing employee training programme...

51.     Financial institutions must ensure that appropriate bank personnel are trained in

all aspects of the regulatory requirements of the BSA and the banks internal BSA compliance

and AML policies and procedures. According to the Bank Secrecy Act/Anti-Money Laundering

Comptroller's Handbook, September 2000, at 6-7, an effective training program includes

provisions to ensure that:

> All bank personnel, including senior management, who have contact with customers (whether in person or by phone), who see customer transaction activity, or who handle cash in any way, receive appropriate training. Those employees include persons involved with branch administration; customer service; lending; private, or personal banking; correspondent banking (international and domestic); trust; discount brokerage; funds transfers; safe deposit/custody; and vault activities.
>
> Training is ongoing and incorporates current developments and changes to the BSA, anti-money laundering laws, and OCC and FinCEN regulations. New and different money laundering schemes involving customers and financial institutions should be addressed. It also should include examples of money laundering schemes and cases, tailored to the audience, and in ways in which such activities can be detected or resolved.
>
> Training focuses on the consequences of an employee's failure to comply with established policy and procedures (e.g., fines or termination). Programs should provide personnel with guidance and direction in terms of banking policies and available resources.

52.     Due Diligence is necessary when opening and maintaining accounts. According to

14

the Wolfsberg AML principles[6], global anti-money laundering standards and guidelines

established by the world's largest banks, a "bank will endeavor to accept only those clients whose

source of wealth and funds can be reasonably established to be legitimate… Mere fulfillment of

internal review procedures does not relieve the private banker of this basic responsibility."

53.     The Wolfsberg AML principles require that, for all accounts, the bank must

exercise the following due diligence principles to identify the principle beneficial owners of an

account:

> Natural persons: when the account is in the name of an individual, the private
> banker must establish whether the client is acting on his/her own behalf. If doubt
> exists, the bank will establish the capacity in which and on whose behalf the
> account holder is acting.

> Legal entities: where the client is a company, such as a private investment
> company, the private banker will understand the structure of the company
> sufficiently to determine the provider of funds, principal owner(s) of the shares
> and those who have control over the funds, e.g. the directors and those with the
> power to give direction to the directors of the company. With regard to other
> shareholders the private banker will make a reasonable judgment as to the need
> for further due diligence.

> Unincorporated associations: the above principles apply to unincorporated
> associations.

54.     To meet the due diligence standards established by the Wolfsberg AML principles,

banks should meet the client before opening the account and must collect and record the following

---

[6] The Wolfsberg Group is an association of large global banks that came together n 2000, at the Chateau Wolfsberg in north-eastern Switzerland, which agreed to a set of global anti money-laundering guidelines for international private banks. The banks initailly involved included ABN AMRO Bank, Barclays Bank, Banco Santander Central Hispano, S.A., The Chase Manhattan Private Bank, Citibank, N.A., Credit Suisse Group, Deutsche Bank AG, HSBC, J.P. Morgan, Societe Generale, and UBS AG. The Group's purpose is to develop financial services industry standards for Know Your Customer, Anti-Money Laundering and Counter Terrorist Financing Policies. The Wolfsberg Anti-Money Laundering Principles for Private Banking were published in October 2000 (and revised in May 2002). In January 2002, the Group published a Statement on the Financing of Terrorism and, in November 2002, released the Wolfsberg Anti-Money Laundering Principles for Correspondent Banking. The Wolfsberg Group's most recent Statement, on Monitoring Screening and Searching, was published in September 2003. The standards are widely known.

information about each account: Purpose and reasons for opening the account; Anticipated

account activity; Source of wealth (description of the economic activity which has generated the

net worth); Estimated net worth; Source of funds (description of the origin and the means of

transfer for monies that are accepted for the account opening); and References or other sources to

corroborate reputation information where available.

55.     The FATF warns that mere financial accounting and auditing might be

insufficient protection against the abuse. "Direct field audits of programmes may be, in some

instances, the only method for detecting misdirection of funds. Examination of field operations

is clearly a superior mechanism for discovering malfeasance of all kinds, including diversion of

funds to terrorists." FATF Task Force on Money Laundering, Combating the Abuse of Non-

Profit Organisations," at ¶ 11, p. 3 (October 11, 2002).

56.     Non-profit Organizations, particularly those held out as charitable organizations,

constitute high-risk accounts warranting enhanced due diligence and scrutiny, because the

mechanism of charitable fundraising has, "in numerous instances … been used to provide a

cover for the financing of terror." FATF on Money Laundering, "Combating the Abuse of Non-

Profit Organisations: International Best Practices," at ¶ 4, p. 1 (October 11, 2002).

57.     Although "[j]urisdictions may differ on the scope of purposes and activities that

are within the definition of 'charity,' … all should agree that ['charity'] does not include

activities that directly or indirectly support terrorism, including actions that could serve to induce

or compensate for participation in terrorist acts." FATF, "Combating the Abuse of Non-Profit

Organisations: International Best Practices," at ¶ 5, p. 2 (October 11, 2002).

58.     The misuse of non-profit organizations for the financing of terrorism has been a

16

crucial weak point in the global struggle to stop such funding at its source. This issue has captured the attention of the Financial Action Task Force (FATF), the G7, and the United Nations, as well as national authorities in many regions. FATF on Money Laundering, "Combating the Abuse of Non-Profit Organisations: International Best Practices," at ¶ 1, p. 1 (October 11, 2002).

59.     The FATF recognizes that the importance of requiring charitable fund-raising and transfer of funds to go through formal or registered channels underscores the benefit of enlisting the established powers of the bank regulatory system – suspicious activity reporting, know-your-customer (KYC) rules, etc – in the fight against terrorist abuse or exploitation of non-profit organizations. FATF on Money Laundering, "Combating the Abuse of Non-Profit Organizations: International Best Practices," at ¶ 21, p. 5 (October 11, 2002).

60.     Enforcement is required. Pursuant to the Bank Secrecy Act, 31 U.S.C. §§ 5311 to 5324, the Secretary of the Treasury has prescribed regulations governing financial institutions' obligations to report certain currency transactions. 31 U.S.C. § 5313. In prescribed circumstances, financial institutions, including the defendants, must file Suspicious Activity Reports (Treasury Department Form 90-22.47), pursuant to section (a) of 31 CFR § 103.18 (Treasury), 12 CFR 21.11 (OCC), 12 CFR §§ 208.60 and 208.62 (Federal Reserve), 12 CFR §§ 353.1 and 351.3 (FDIC) and 12 CFR § 563.180 (OTS) and Currency Transaction Reports (IRS Form 4789), pursuant to 31 CFR § 103.22.

61.     Banks must have a written policy on the identification of and follow-up on unusual or suspicious activities. Some examples of unusual or suspicious activities may include:

Account transactions or other activities which are not consistent with the customer's business or the account's due diligence file;

Cash transactions over a certain amount;

Account transactions or other activities that seek to avoid reporting or record keeping requirements;

Wire, pass-through, and in-and-out transactions.

62.     Following the September 11th attacks on the United States, far greater terrorist financing legislation was enacted. As President Bush stated "[w]e put the world's financial institutions on notice: if you do business with terrorists, if you support them or sponsor them, you will not do business in the United States of America."[7]

**HSBC/AL RAJHI BANK**

63.     In a 2012 Report titled *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History,* the United States Senate published it's findings from an investigation of HSBC.[8] The Senate concluded:

The United States has devoted significant resources to stopping some of the most dangerous persons and jurisdictions threatening the world today from utilizing the U.S. financial system, including terrorists . . . To implement the law, the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) has developed a list of prohibited persons and countries which banks use to create an "OFAC filter" to identify and halt potentially prohibited transactions. Transactions stopped by this filter typically undergo an individualized review to see if the transaction can proceed or the funds must be blocked. Because the OFAC filter can end up delaying or blocking transactions that are permitted under U.S. law or by other jurisdictions, some non-U.S. financial institutions have used tactics to circumvent it. Common tactics include stripping information from wire transfer documentation

---

[7]  Remarks of President George W. Bush in his address to the Financial Crime Enforcement Network in Vienna, Va., Nov., 7, 2001

[8]  *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing*: HSBC Case History; United States Senate Permanent Sub-Committee on Investigations; Majority and Minority Staff Report. July 17, 2010; pages 5-7, 238-239. (Available at http://www.hsgac.senate.gov/download/?id=2A76C00F-7C3A-44C8-902E-3D9B5DBD0083).

to conceal the participation of a prohibited person or country, or characterizing a
transaction as a transfer between banks in approved jurisdictions, while omitting
underlying payment details that would disclose participation of a prohibited
originator or beneficiary.

**HSBC is a global bank with a strong presence in many countries confronting
terrorist threats. If safeguards are lacking, HBUS offers a gateway for
terrorists to gain access to U.S. dollars and the U.S. financial system. HSBC
has a legal obligation to take reasonable steps to ensure it is not dealing with
banks that may have links to or facilitate terrorist financing.**

For decades, HSBC has been one of the most active global banks in the Middle
East, Asia, and Africa, despite being aware of the terrorist financing risks in those
regions. In particular, HSBC has been active in Saudi Arabia, conducting
substantial banking activities through affiliates as well as doing business with
Saudi Arabia's largest private financial institution, Al Rajhi Bank. After the 9/11
terrorist attack in 2001, evidence began to emerge that Al Rajhi Bank and some of
its owners had links to financing organizations associated with terrorism, including
evidence that the bank's key founder was an early financial benefactor of al Qaeda.

Banks rarely carry explicit links to terrorist financing, but . . . [i]n the case of Al
Rajhi Bank, the factors included the naming of a key bank official in a list of al
Qaeda financial benefactors, a U.S. law enforcement search of Al Rajhi nonprofit
and business ventures in the United States to disrupt terrorist financing, a CIA
report targeting the bank for being a "conduit" for extremist finance, the bank's
refusal to produce authenticating bank documents for use in the criminal trial of a
client who cashed travelers cheques at the bank for use by terrorists, and multiple
accounts held by suspect clients.

64.     Despite knowing that Al Rajhi Bank had links to terrorist financing, the HSBC

Defendants aided and abetted terrorist activity by agreeing to alter, falsify, or omit information

from payment messages that involved prohibited countries and institutions for the express purpose

of concealing financial activities and transactions from detection, scrutiny, or monitoring inside

the U.S. by U.S. regulators, law enforcement, and/or depository institutions.

65.     This agreement targeted the United States banking market and made it possible for

Al Rajhi Bank and other prohibited financial institutions to transfer, through HSBC: (1) hundreds

of millions of dollars in U.S. currency through the U.S. in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies; and (2) hundreds of millions of U.S. dollars, that had passed through the U.S. financial system, to *AQI, al-Qaeda*, and other terrorist organizations actively engaged in plotting attacks against the United States and its citizens.

66.     Each Defendant knowingly entered into and participated in this scheme with an objective to conceal billions of U.S. dollars passing through the U.S. financial system from detection, scrutiny, or monitoring by U.S. regulators, U.S. law enforcement, and/or U.S. depository institutions.

67.     Each Defendant committed numerous acts in furtherance of this scheme and knowingly and unlawfully agreed to strip information from transactions involving Al Rajhi Bank and other prohibited financial institutions while knowing that Al Rajhi Bank had ties to terrorist financing.

68.     Each Defendant knew of, or was deliberately indifferent to, the scheme's purposes to facilitate transactions of millions of U.S. dollars for the benefit of prohibited groups, including *al-Qaeda* and *AQI*.

69.     The scheme was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries. By providing *AQI* and other terrorist organizations with U.S. dollars, HSBC's scheme with Al Rajhi Bank substantially assisted *AQI* in committing the acts of international terrorism that injured the Plaintiffs.

70.     By knowingly entering into the scheme, by knowing or being deliberately indifferent to its purposes, and by committing multiple overt acts in furtherance of the scheme, the

HSBC Defendants provided Al Rajhi Bank with the means by which it could transfer millions of U.S. dollars to *AQI*, which were actively engaged in planning and perpetrating the murder and maiming of Americans, including the victims of the 2005 bombings in Amman.

71.     Each of the HSBC Defendants knew that Al Rajhi Bank and some of its owners had links to financing organizations associated with terrorism, including evidence that the bank's key founder was an early financial benefactor of *al-Qaeda.*

72.     Despite that knowledge, each of the HSBC Defendants knowingly entered into a scheme with Al Rajhi Bank to conceal hundreds of millions of dollars in fund transfers routed through the United States.

73.     The scheme was organized to keep U.S. depository institutions, law enforcement, and counter-terrorism agencies blind to the flow of U.S. dollars it was moving though the U.S. financial system on behalf of prohibited institutions.

74.     Each of the Defendants took affirmative steps to conceal from U.S. depository institutions, law enforcement, and counter-terrorism agencies the flow of hundreds of millions of U.S. dollars it was moving through the United States, including transfers for the benefit of *al-Qaeda* and *AQI*.

75.     By knowingly agreeing to enter the scheme, and participating in and committing overt acts in the course of the scheme that resulted in damage and injury to the Plaintiffs, Defendants committed acts of international terrorism as defined by 18 U.S.C. §§ 2331, 2339A and 2339B that caused injury to the Plaintiffs in this action, and are civilly liable under 18 U.S.C. § 2333(a) of the Anti-Terrorism Act to Plaintiffs, American citizens who have been injured by reason of the acts of international terrorism by *AQI* in Amman.

21

**HSBC's CONDUCT**

76.     During hearings in 1990 regarding the then-pending Antiterrorism Act of 1990,

Joseph A. Morris, a former Department of Justice Attorney and former General Counsel of the

United States Information Agency testified:

> International terrorism has become, in many respects, an industry. It rests on a
> foundation of money. Money is often more important to the masters of terrorism
> than are people. That they care little for their victims goes without saying; but it is
> instructive of many terrorist organizations appear to care little for their own
> operatives, treating them as fungible and dependable.

77.     Accordingly, the United States has devoted significant resources to stopping some

of the most dangerous persons and jurisdictions threatening the world today from utilizing the

U.S. financial system.

78.     To implement the law and the international standards applicable to financial

institutions, the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) developed

a list of prohibited persons and countries which banks use to create an "OFAC filter" to identify

and halt potentially prohibited transactions.

79.     Because the OFAC filter can delay or block transactions, HSBC used

tactics to circumvent it when sending OFAC sensitive transactions through the United States to

correspondent accounts at HBUS so that they could continue doing business with prohibited

persons and financial institutions that were known to be associated with terrorist financing.

80.     Common tactics included stripping information from wire transfer documentation

to conceal the participation of a prohibited country or person, or characterizing a transaction as a

transfer between banks in an approved jurisdiction, while omitting underlying payment details that

would disclose participation of a prohibited originator or beneficiary.

81.     For example, unlawful funds transfers were sent through HBUS by:

Deleting references to prohibited persons or institutions from the payment
instructions (a/k/a "stripping" the transactions) or otherwise altering the messages
to either omit or falsify information that would have otherwise indicated the
prohibited person's or institution's involvement in the transaction; and

Styling the transaction as a bank-to-bank "cover" transaction between two,
non-prohibited banks, solely because the MT 202 payment message format used
for such transactions did not expressly obligate HSBC to identify the transaction's
originator and beneficiary, thus avoiding any disclosure of the transaction's
prohibited connections, and blocking HBUS's electronic OFAC filters from
recognizing the transaction.

82.     By circumventing OFAC regulations, the HSBC Defendants had the ability to

engage in prohibited business and financial transactions with prohibited persons or corporations

inside the United States financial system.

83.     The affiliates' use of these practices was brought to the attention of HSBC

Compliance by HBUS personnel.

84.      Despite this information, HSBC Compliance did not take decisive action

to stop the conduct or inform HBUS of the extent of the activity. Instead, the HSBC Defendants

continued to undertake various methods to facilitate payments to prohibited persons or institutions

that would evade U.S. sanctions.

85.     From 2002-2007, HSBC Defendants actively participated in the scheme when

some HSBC affiliates sent potentially prohibited transactions through HBUS within the United

States, involving prohibited countries or persons.

86.     An outside auditor hired by HBUS has so far identified that from 2001-2007, more

than 28,000 undisclosed, OFAC sensitive transactions were sent through HBUS – these transactions amounted to 19.7 billion dollars.

87.    On December 11, 2012, HBUS entered into a deferred prosecution agreement ("DPA") with the United States Department of Justice ("DOJ"). The DOJ issued a press release announcing that HBUS admitted to AML sanctions violations, as well as the fact that they would pay $1.265 billion USD forfeiture.

88.    In addition to the forfeiture under the DPA, HBUS also agreed to pay $665 million USD in civil penalties for their AML program violations.

89.    In response to the DOJ press release, United States Attorney for the Eastern District of New York Loretta Lynch was quoted as stating, "HSBC's willful flouting of U.S. sanctions laws and regulations resulted in the processing of hundreds of millions of dollars in OFAC-prohibited transactions. Today's historic agreement, which imposes the largest penalty in any [Bank Secrecy Act] prosecution to date, makes it clear that all corporate citizens, no matter how large, must be held accountable for their actions."

90.    Using their scheme to evade OFAC filters by stripping identifying information from transfers, the HSBC Defendants provided Al Rajhi Bank with a wide range of banking services both inside and outside the United States. Those services include U.S. Dollars, wire transfers, foreign exchange, trade financing, and asset management services.

91.    In 2001, evidence began to emerge that Al Rajhi Bank and some of its owners had links to financing organizations associated with terrorists, including evidence that the bank's key founder was an important benefactor of *al-Qaeda*.

92.    Following the terrorist attack on the United States on September 11, 2001, the

U.S. government began an intensive investigation into where and how terrorists obtain funding, repeatedly returning to Saudi Arabia, its banks, and its nationals as a suspected source.

93.     In 2004, the 9/11 Commission charged with investigating the terrorist attack issued a report which stated that "Saudi Arabia's society was a place where al Qaeda raised money directly from individuals and through charities. It was the society that produced 15 of the 19 hijackers."

94.     Al Rajhi Bank gained notoriety for providing banking services to several of the hijackers in the 9/11 terrorist attack, including Abdulaziz al Omari who was aboard American Airlines Flight 11. Al Omari frequently utilized a credit card drawn on Al Rajhi Bank in the planning of the attacks. On September 7, 2001, four days before the 9/11 attacks, al Omari received a wire transfer from Al Rajhi Bank.

95.     Despite their knowledge of these ties, HSBC continued to do business with Al Rajhi Bank and therefore continued making U.S. dollars available to Al Rajhi Bank clients.

96.     In March 2002, a search of the Bosnian offices of the Benevolence International Foundation, a Saudi based nonprofit organization which was also designated a terrorist organization by the U.S. Treasury Department, led to seizure of a CD-ROM and computer hard drive with numerous al Qaeda documents. One computer file contained scanned images of several hundred documents chronicling the formation of al Qaeda. One of the scanned documents contained a handwritten list of twenty (20) individuals identified as key financial contributors to al Qaeda. Osama bin Laden referred to that group of individuals as the "Golden Chain."

97.     One of the twenty (20) handwritten names in the Golden Chain document

identifying al Qaeda's early key financial benefactors is Sulaiman bin Abdul Aziz Al Rajhi, one of

Al Rajhi Bank's key founders and most senior officials.

98.     The Golden Chain document has been discussed in the 9/11 Commission

report, in Federal Court filings, and civil lawsuits. Media reports as early as March of 2003 noted

that Al Rajhi's name was included on the Golden Chain list, and that U.S. intelligence and law-

enforcement agencies have studied connections between the Al Rajhi family and its bank to al

Qaeda through corporate and bank records. More than two years prior to November 9, 2005,

HSBC was clearly on notice of both the Golden Chain list of financial benefactors to al Qaeda,

and Sulaiman bin Abdul Aziz Al Rajhi's place on the list, yet they continued to provide U.S.

dollars and banking services to Al Rajhi Bank.

99.     In March 2002, as part of Operation Green Quest, a U.S. Treasury effort to

disrupt terrorist financing activities in the United States, U.S. law enforcement agents conducted a

search of 14 interlocking business and nonprofit entities in Virginia associated with the SAAR

Foundation, an Al Rajhi-related entity, and the Al-Rajhi family. A law enforcement affidavit

supporting the search warrant detailed numerous connections between the targeted entities and Al

Rajhi family members and related ventures. The affidavit stated that over 100 active and defunct

nonprofit and business ventures in Virginia were part of what it described as the "Safa Group,"

which the United States had reasonable cause to believe was "engaged in the money laundering

tactic of 'layering' to hide from law enforcement authorities the trail of its support for terrorists."

100.     An affidavit filed by the United States in support of the search warrant alleged

that the Safa Group appeared to be involved with providing material support to terrorism. Among

other matters, it alleged that members of the Safa Group had transferred "large amounts of funds .

26

. . directly to terrorist-front organizations since the early 1990's." According to the affidavit, "one source of funds flowing through the Safa Group [was] from the wealthy Al-Rajhi family in Saudi Arabia.

101.    Over 150 law enforcement officers participated in the 2002 search, generating widespread media coverage of the Safa Group's, and Al Rajhi Bank's, ties to terrorist financing. Despite this knowledge, HSBC continued to do business with Al Rajhi Bank.

102.    As early as 2002, the Wall Street Journal ran an article describing how Saudi Arabia was monitoring Al Rajhi Bank accounts for terrorism.

103.    A 2003 U.S. Central Intelligence Agency report concluded that "Senior Al Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank."

104.    In 2005, it became public that Soliman Al-Buthe, a designated terrorist financer, had been a client of Al Rajhi Bank in Saudi Arabia, as had the foreign terrorist organization al-Haramain Islamic Foundation.

105.    Al Rajhi Bank was associated with Islami Bank Bangladesh Ltd., which was located in a country at high risk for money laundering, provided an account to a Bangladeshi accused of involvement with a terrorist bombing, and had been fined three times for violating AML requirements in connection with providing bank services to militants. HSBC was aware of their client's involvement, as HSBC's own research indicated that the Al Rajhi group held about one-third of the bank's shares. Despite this knowledge, HSBC continued to provide Al Rajhi Bank with U.S. dollars and access to the United States financial system.

106.    In 2003, HSBC's internal Financial Intelligence Group (FIG) raised questions

about the International Islamic Relief Organization (IIRO). Until at least December 2004, the IIRO arranged for donors to send donations directly to accounts it held at Al Rajhi Bank, advertising the accounts in various publications. The IIRO has been linked to al Qaeda and other terrorist groups, plots to assassinate President Bill Clinton and the Pope, attacks on the Brooklyn Bridge and Lincoln Tunnel, and the 1993 attack on the World Trade Center. Al Rajhi Bank and Sulaiman bin Abdul Aziz Al Rajhi himself had ties to the IIRO. Despite their questions about the IIRO, HSBC continued to do business with Al Rajhi Bank.

107.     In 2004, the United States designated as terrorist organizations several Saudi-based nonprofit organizations that were also clients of Al Rajhi Bank. Once again, HSBC was aware of these designations but did nothing to cut ties with the bank.

108.     According to HSBC records, HSBC supplied U.S. dollars to Al Rajhi Bank for more than twenty five (25) years. HBUS opened a banknotes account for Al Rajhi Bank in January 2001, and the U.S. dollars were physically delivered to Al Rajhi Bank in Saudi Arabia. HBUS did not close its banknotes account with Al Rajhi Bank until October 2010.

109.     While Al Rajhi Bank was its client, HSBC classified Al Rajhi Bank as a "Special Category of Client," its highest risk designation. This designation was due in part to the bank's location in Saudi Arabia, which HSBC classified as a high risk country. In addition, HSBC noted that the bank was owned in part by a Politically Exposed Person, Abdullah Abdul Al Rajhi, who was a major shareholder, a member of the bank's board of directors, and a member of the Northern Borders Provincial Council in Saudi Arabia. Al Rajhi Bank was one of only a handful of bank clients that HSBC had classified as "Special Category of Client" clients.

110.     In 2002, Douglas Stolberg, the head of Commercial and Institutional Banking

at HBUS authored an email to a senior HBUS executive which noted that the there were concerns

regarding the ongoing maintenance of accounts for Al Rajhi. The email also stated, "this has

become a fairly high profile situation. Compliance's concerns relate to the possibility that Al

Rajhi's account may have been used by terrorists. If true, this could potentially open HBUS up to

public scrutiny and/or regulatory criticism."

111.     All HSBC Defendants knew of the evidence indicating that Al Rajhi Bank was

associated with terrorist financing. In fact, in January 2005, despite its longstanding relationship

with Al Rajhi Bank, HSBC Group Compliance decided that its U.S.-based businesses should

sever ties with Al Rajhi Bank due to terrorist financing concerns. Despite their concerns, however,

HSBC reversed itself in May, only four months later, and allowed each affiliate to choose for

themselves whether or not to continue doing business with Al Rajhi Bank.

112.     Taken together, the Al Qaeda Golden Chain document, the 2002 search of Al

Rajhi-related entities in Virginia, the 2003 CIA report, countless government, news, and media

reports, and HSBC's own records present an unusual array of troubling allegations about a

particular financial institution.

113.     HSBC was fully aware of the suspicions that Al Rajhi Bank and its owners

were associated with terrorist financing and had connections to countless terrorist organizations.

HSBC even described many of the alleged links to terrorist financing in the Al Rajhi Bank client

profile. Despite this knowledge, HSBC chose to provide Al Rajhi Bank with banking services and

therefore knowingly and substantially assisted terrorist organizations acquire the U.S. dollars

required to carry out their acts of terror.

114.     Despite ongoing troubling information regarding Al Rajhi Bank's connection

29

to terrorist financing, the HSBC Defendants provided nearly $1 billion in U.S. dollars to Al Rajhi Bank.

115.    This activity with Al Rajhi Bank provided *al-Qaeda* and *AQI* exactly what they so desperately desired - access to the U.S. financial system so they could use U.S. Dollars to finance their attacks on U.S. targets.

116.    While HSBC provided nearly $1 billion in U.S. dollars to Al Rajhi Bank, an average *AQI* terrorist attack costs only $2,700 U.S. dollars.

117.     All HSBC Defendants knew that the transactions passing through the United States and the funds deposited in the accounts established and maintained by it, or otherwise belonging to, disbursed by, or under the control of it, were used to support, encourage, entice and make possible these suicide bombings in that the HSBC Defendants established, maintained and administered a highly organized scheme to circumvent United States regulations in order to make financial payments to the terrorist groups *al-Qaeda* and *AQI* possible.

### COUNT I: HSBC's CIVIL LIABILITY UNDER  18 U.S.C. § 2333

Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

118.    The Anti-Terrorism Act of 1990 imposes liability at any point along the causal chain of terrorism that would interrupt, or at least imperil, the flow of money. S. Rep. 102-342 at, 22 (1992).

119.    The HSBC Defendants, collectively and individually, were under a heightened duty

as a fiduciary of banks and charities, and as a public servant endowed with the public's trust. That duty involved conducting itself in conformity with high ethical standards, complying with the laws and regulations applicable to the industry, avoiding the use of the bank's services for illegal purposes, and cooperating fully and appropriately with law enforcement authorities.

120.    The HSBC Defendants, collectively and individually, were under a general duty to implement and enforce due diligence methods to prevent its banks from being used to intentionally injure, maim or kill, commit criminal or tortious acts, endanger lives, and engage in activity that would foreseeably lead to the personal injury and/or death of the plaintiffs.

121.    HSBC breached these duties and/or aided and abetted the commission of these crimes by:

    a) Failing to ensure that business is conducted in conformity with high ethical standards and that laws and regulations pertaining to financial transactions are adhered to;

    b) Offering services or providing active assistance in transactions which they have good reason to suppose are associated with money-laundering activities and/or terrorist financing;

    c) Failing to cooperate fully with national law enforcement authorities to the extent permitted by specific local regulations relating to customer confidentiality;

    d) Failing to take appropriate care to avoid providing support or assistance to customers seeking to deceive law enforcement agencies through the provision of altered, incomplete or misleading information;

    e) Failing to report suspicious activities to the proper authorities;

    f) Failing to sever relations and close or freeze accounts with customers it knew were engaged in money-laundering and/or terrorist financing;

    g) Failing to exercise due diligence in ensuring that their financial institutions do not become conduits for terrorist financing;

h) Failing to implement and/or enforce procedures that would implement international standards applicable to anti-money laundering efforts;

i) Failing to adhere to Know Your Customers standards;

j) Failing to exercise due diligence and heightened scrutiny to accounts held out as a mechanism for fundraising charitable organizations;

k) Entering into a scheme with Al Rajhi bank, a known terrorist financer, to engage in prohibited business and financial transactions inside the United States;

l) Actively circumventing OFAC regulations and violating anti-money laundering efforts prescribed by law; and

m) Knowingly providing financial resources and support to institutions engaging in illegal and/or tortious terrorist activities; and

n) Knowingly and substantially assisting terrorist organizations by continuing to do business with entities it knew had links to terrorist financing.

122.    HSBC'S breaches of these duties were a proximate cause of the deaths and personal injuries inflicted on the victims of the November 9, 2005 suicide bombings in Amman, Jordan, and specifically, Plaintiffs and Plaintiffs' Decedents.

WHEREFORE, plaintiffs, JEFFREY SIEGEL, Administrator of the Estate of MOUSTAPHA AKKAD, deceased, and MOUSTAPHA AKKAD's heirs; SOOHA AKKAD, individually; SUSAN GITELSON, Special Administrator of the Estate of RIMA AKKAD MONLA, deceased, and RIMA AKKAD MONLA's heirs, ZIAD MONLA, individually, and on behalf of his minor sons; and MICHAEL BUTLER, demand judgment against defendants, HSBC BANK USA, N.A. ("HBUS") and HSBC NORTH AMERICA HOLDINGS, INC. ("HSBC-NORTH AMERICA"), for a sum in excess of the jurisdictional limits to bring this lawsuit in the

United States District Court of the Southern District of New York, including treble damages

pursuant to 18 U.S.C. § 2333, together with costs, attorneys fees and interest.


/s/ William T. Gibbs


William T. Gibbs
Corboy & Demetrio, P.C.
Attorney for Plaintiffs
33 North Dearborn Street, 21st Floor
Chicago, Illinois  60602
(312) 346-3191
Firm I.D. No. 108

**Certificate of Service**

I, William T. Gibbs, hereby certify that on March 16, 2018, I electronically filed a true and correct copy of Plaintiffs' Third Amended Complaint through the CM/ECF system for the United States District Court for the Southern District of New York, which will send a notice of electronic filing to all counsel of record and make it available for viewing and downloading from the CM/ECF system.

/s/ William T. Gibbs

William T. Gibbs
Corboy & Demetrio, P.C.
Attorney for Plaintiffs
33 North Dearborn Street, 21st Floor
Chicago, Illinois 60602
(312) 346-3191
Firm I.D. No. 108