#108   WTG\kah   4/18/2018                                                                                      2007S-0284

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

JEFFREY SIEGEL, Administrator of the
Estate of MOUSTAPHA AKKAD, deceased,
and MOUSTAPHA AKKAD's heirs; SOOHA
AKKAD, individually; SUSAN GITELSON,
Special Administrator of the Estate of RIMA
AKKAD MONLA, deceased, and RIMA
AKKAD MONLA's heirs, ZIAD MONLA,
individually, and on behalf of his minor sons;
and MICHAEL BUTLER,

                 Plaintiffs,

                 v.

HSBC BANK USA, N.A. ("HBUS") and
HSBC NORTH AMERICA HOLDINGS,
INC. ("HSBC-NORTH AMERICA"),

                 Defendants.

No. 1:17-cv-06593-DLC

Honorable Denise L. Cote

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES …………………...………………………………………ii

INTRODUCTION ………………………………………………………………...1

FACTS …...………………………………………………………....................1

LEGAL STANDARD …………………………...…………………………………..4

ARGUMENT……………...…………………………………………………………5

I.     *LINDE* PRECLUDES PRIMARY LIABILITY UNDER THE
       ANTI-TERRORISM ACT………………………...………………………..…5

II.    PLAINTIFFS ALLEGATIONS AGAINST DEFENDANTS ARE SUFFICIENT
       TO STATE A CLAIM FOR AIDING AND ABETTING LIABILITY UNDER
       THE ANTI-TERRORISM ACT……………………...……………………...5

       A.  Defendants aided *AQI,* who performed a wrongful act which
           caused injury to Plaintiffs and Plaintiffs' decedents………………….…..7

       B.  The Defendants were aware of their role as part of an overall
           illegal activity at the time they were providing assistance…………..……...8

       C.  The Defendants knowingly and substantially assisted *AQI* in
           carrying out the November 5, 2009 bombings in Amman………..…………...13

CONCLUSION…………………………………………………………………..15

## **TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)……………………………………………………4

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)……………………………………4, 5

*Boim v. Quranic Literary Inst. & Holy Land Found. For Relief and Dev.,*
291 F.3d 1000, 1021 (7th Cir. 2002)………………………………………………..…………1, 6

*Chambers v. Time Warner,* 282 F.3d 147, 152 (2d Cir. 2002)…………………………….....…4

*Erickson v. Pardus,* 551 U.S. 89, 93-94 (2007)…………………………………………..………4

*Global Network Communications, Inc. v. City of New York,*
458 F.3d 150, 155 (2d Cir. 2006)…………………………………………………………………4

*Halberstam v. Welch,* 705 F.2d 472 (D.C. Cir. 1983)……………………………………....…7, 8, 13

*Linde v. Arab Bank, PLC,* 882 F.3d 312 (2018)………………………………..……………5, 7, 8, 13

*McLain v. Real Est. Bd. of New Orleans, Inc.,* 444 U.S. 232, 246 (1980)………………………..5

*Rosemond v. United States,* 134 S. Ct. 1240, 1242 (2014)………………………………....……8

*Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir. 1988)…………………………………....………4

**Statutes, Rules, and Reports**

18 U.S.C. § 2333………………………………………………………………………1, 4, 5, 6

FED. R. CIV. P. 8……………………………...…………………………………………………4

Permanent Subcommittee on Investigations, *U.S. Vulnerabilities to
Money Laundering, Drugs, and Terrorist Financing: HSBC Case
History*, U.S. Senate (2012)………………………………..…….…………………………..2

Pub. L. 114–222 § 2, 130 Stat. 852, 852 (2016)………………………..……………………7

S. Rep. 102-342, at 22…………………………………………………………...……6

## INTROUCTION

"The only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit violent acts." *Boim v. Quranic Literary Inst. & Holy Land Found. For Relief and Dev.,* 291 F.3d 1000, 1021 (7th Cir. 2002). This action arises out of a terrorist bombing aimed at American nationals in Jordan on November 9, 2005. The bombing was aided by the Defendants' nearly ten-year scheme to circumvent U.S. banking regulations and resultant material support of *al-Qaeda* and *al-Qaeda in Iraq* ("*AQI*"), both designated Foreign Terrorist Organizations.

The HSBC Defendants willingly provided U.S. banking services to prohibited persons and institutions with ties to international terrorism in violation of the Anti-Terrorism Act, 18 U.S.C. § 2333 ("ATA"). As alleged in Plaintiffs' Third Amended Complaint at Law, the moving Defendants took affirmative steps to knowingly and intentionally circumvent U.S. financial regulations in order to facilitate material support of designated Foreign Terrorist Organizations, such as *AQI*. The conduct of these Defendants was specifically designed to effectuate the flow of billions of U.S. dollars through the United States in violation of U.S. laws.

## FACTS

On November 9, 2005 (*i.e.,* 9/11/05 in the Arabic calendar) in Amman, Jordan, four *AQI* suicide bombers, wearing bomb belts packed with the powerful explosive RDX and ball bearings designed to inflict the maximum number of casualties, entered the lobbies of three different hotels known to be frequented by Americans. (ECF 103, Plaintiffs' Third Amended Complaint at Law, attached hereto as Exhibit A, at ¶ 4). The suicide bombers detonated their bombs within minutes of one another, killing fifty-seven (57) civilians and wounding one-hundred-ten (110) others. (*Id.*)

1

One of the hotels targeted by *AQI* suicide bombers was the Grand Hyatt Amman, where Plaintiffs' Decedents, Moustapha Akkad and his daughter, Rima Akkad Monla, both nationals of the United States, were killed. (*Id.* at ¶ 5). Among the injured were Plaintiffs, Michael Butler and Moustapha Akkad's wife, Sooha Akkad, also both nationals of the United States. (*Id.*) The attack was perpetrated by terrorists using material support and resources provided by the Defendants' scheme to circumvent U.S. banking regulations in order to provide foreign banks, including those with ties to *AQI,* access to the U.S. financial system. (*Id.* at ¶ 6).

In a 2012 Report, the United States Senate published findings from a thorough investigation of HSBC's international banking practices. (Permanent Subcommittee on Investigations, *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History*, U.S. Senate (2012), attached hereto as Exhibit B). The Senate concluded:

> The United States has devoted significant resources to stopping some of the most dangerous persons and jurisdictions threatening the world today from utilizing the U.S. financial system, including terrorists . . . To implement the law, the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) has developed a list of prohibited persons and countries which banks use to create an "OFAC filter" to identify and halt potentially prohibited transactions. Transactions stopped by this filter typically undergo an individualized review to see if the transaction can proceed or the funds must be blocked.

> Because the OFAC filter can end up delaying or blocking transactions that are permitted under U.S. law or by other jurisdictions, some non-U.S. financial institutions have used tactics to circumvent it. Common tactics include stripping information from wire transfer documentation to conceal the participation of a prohibited person or country, or characterizing a transaction as a transfer between banks in approved jurisdictions, while omitting underlying payment details that would disclose participation of a prohibited originator or beneficiary.

> **HSBC is a global bank with a strong presence in many countries confronting terrorist threats. If safeguards are lacking, HBUS offers a gateway for terrorists to gain access to U.S. dollars and the U.S. financial system. HSBC has a legal obligation to take reasonable steps to ensure it is not dealing with banks that may have links to or facilitate terrorist financing.**

> For decades, HSBC has been one of the most active global banks in the Middle East, Asia, and Africa, despite being aware of the terrorist financing risks in those regions. In particular, HSBC has been active in Saudi Arabia, conducting substantial banking activities through affiliates as well as doing business with Saudi Arabia's largest private financial institution, Al Rajhi Bank. After the 9/11 terrorist attack in 2001, evidence began to emerge that Al Rajhi Bank and some of its owners had links to financing organizations associated with terrorism, including evidence that the bank's key founder was an early financial benefactor of al Qaeda.

> Banks rarely carry explicit links to terrorist financing, but . . . [i]n the case of Al Rajhi Bank, the factors included the naming of a key bank official in a list of *al Qaeda* financial benefactors, a U.S. law enforcement search of Al Rajhi nonprofit and business ventures in the United States to disrupt terrorist financing, a CIA report targeting the bank for being a "conduit" for extremist finance, the bank's refusal to produce authenticating bank documents for use in the criminal trial of a client who cashed travelers cheques at the bank for use by terrorists, and multiple accounts held by suspect clients.

*Id.* at pp. 5-7; 238-39. (emphasis added).

The HSBC Defendants were aware of these links to terrorist financing, yet still agreed to strip identifying information from transactions involving Al Rajhi Bank and other prohibited financial institutions prior to the Jordanian bombing. (ECF 103 at ¶ 67.)  The Defendants altered, falsified, and/or omitted information from payment messages that involved prohibited countries and institutions in order to conceal these financial activities and transactions from any detection, scrutiny, or monitoring inside the United States. (*Id.* at ¶ 64). These deliberate and illegal actions made it possible for Al Rajhi Bank and other prohibited financial institutions to transfer hundreds of millions of U.S. dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. authorities. (*Id.* at ¶ 65, 73). After passing through the United States, those hundreds of millions of U.S. dollars made their way into the hands of *al-Qaeda, AQI,* and other terrorist organizations actively engaged in plotting attacks against the United States and United States nationals. (*Id.*) The November 9, 2005 attack was then carried out by *AQI* terrorists that used the financial resources provided by the Defendants' scheme. (*Id.* at ¶ 6).

3

By knowingly and substantially assisting the acts of international terrorism that caused injury to Plaintiffs and Plaintiffs' decedents, the Defendants are subject to civil liability for aiding and abetting as set forth in 18 U.S.C. §§ 2333. (*Id.* at ¶ 75.)

## LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all factual allegations in a complaint as true and take them in the light most favorable to the plaintiff. *See Erickson v. Pardus,* 551 U.S. 89, 93-94 (2007). The Rule 12(b)(6) motion to dismiss is designed to "test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits." *Global Network Communications, Inc. v. City of New York,* 458 F.3d 150, 155 (2d Cir. 2006). A court may assess "the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it." *Id.* In considering a 12(b)(6) motion, a court should construe the pleadings liberally, accept all well-pleaded factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. *Chambers v. Time Warner,* 282 F.3d 147, 152 (2d Cir. 2002).

Pleading requirements are set out by Federal Rule of Civil Procedure 8. *See generally* FED. R. CIV. P. 8. A complaint which complies with the Rule must contain "a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). The Rule 8 pleading requirements are designed to "enable [the adverse party] to answer and prepare for trial." *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir. 1988). Rule 8 does not require detailed factual allegations, but requires only that a complaint set forth factual allegations that raise "more than a sheer possibility that a defendant has acted

4

unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Therefore, if the factual allegations sufficiently "raise a right to relief above the speculative level," dismissal is inappropriate. *See Twombly,* 550 U.S. at 555. A complaint cannot be dismissed unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *McLain v. Real Est. Bd. of New Orleans, Inc.,* 444 U.S. 232, 246 (1980).

## <u>ARGUMENT</u>

**I.      *Linde* precludes primary liability under the Anti-Terrorism Act.**

There are two types of liability under the ATA: primary liability and secondary liability for aiding and abetting acts of terrorism. *See generally Linde v. Arab Bank, PLC,* 882 F.3d 312 (2d Cir. 2018). The majority of Defendants' Memorandum of Law is dedicated to why Plaintiffs fail to plausibly allege that Defendants are primarily liable under the ATA. (*See* ECF 105, pp. 7-15). Due to the Second Circuit's *Linde* opinion issued on February 9, 2018, Plaintiffs made no attempt to plead primary liability in their Third Amended Complaint and agree that, pursuant to this Circuit's pronouncement in *Linde,* Defendants are not subject to primary liability. This Court need not consider primary liability under the ATA against these Defendants.

**II.      Plaintiffs' allegations against Defendants are sufficient to state a claim for aiding and abetting liability under the Anti-Terrorism Act.**

The Anti-Terrorism Act ("ATA") affords a civil action for damages to United States Nationals injured by acts of international terrorism. The ATA states that:

> [a]ny national of the United States injured in his or her person, property, or
> business by reason of an act of international terrorism, or his or her estate,
> survivors, or heirs, may sue therefor in any appropriate district court of the United
> States and shall recover threefold the damages he or she sustains and the cost of
> the suit, including attorney's fees.

18 U.S.C. § 2333(a).

5

While the ATA initially only explicitly afforded civil relief against the principals perpetrating acts of international terrorism, liability was officially extended when Congress enacted the Justice Against Sponsors of Terrorism Act ("JASTA") on September 28, 2016. JASTA expanded ATA liability from those who themselves commit acts of international terrorism to "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). JASTA applies to acts of terror which occurred prior to its enactment so long as the act of terrorism was committed by an organization that had been designated as a foreign terrorist organization under Section 219 of the Immigration and Nationality Act as of the date on which such act of international terrorism was committed, planned, or authorized. *Id. AQI,* the organization that committed the act of terrorism before this Court, was designated by the United States as a Foreign Terrorist Organization on December 17, 2004, almost a year before the attacks in Amman. (ECF 103, p. 2). Therefore, aiding and abetting secondary liability is available in this case, pursuant to JASTA.

While aiding and abetting was officially added to the ATA through the enactment of JASTA in 2016, the Seventh Circuit was the first to address whether funding terrorism was actionable aiding and abetting under the ATA in 2002. *Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief And Dev.*, 291 F.3d 1000, 1017 (7th Cir. 2002). In reaching their holding that aiding and abetting liability is appropriate under 18 U.S.C. § 2333, the *Boim* court explained that "if we failed to impose liability on aiders and abettors who knowingly and intentionally funded acts of terrorism, we would be thwarting Congress' clearly expressed intent to cut off the flow of money to terrorists at every point along the causal chain of violence." *Id.* at 1021; *citing* S. Rep. 102-342, at 22. The Seventh Circuit further found that Congress' purpose "could not be

6

met unless liability attached beyond the persons directly involved in acts of violence. The statute would have little effect if violence were limited to the persons who pull the trigger or plant the bomb . . ." *Id.* Tellingly, the court held that, "perhaps more importantly, **there would not be a trigger to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to bankroll the persons who actually commit the violence."** *Id.* (emphasis added).

Fourteen years later, when *Boim's* aiding and abetting holding was added into the ATA itself, Congress' statutory note to the ATA instructed that the "proper legal framework for how [aiding and abetting] liability should function" under the ATA is that identified in *Halberstam v. Welch,* 705 F.2d 472 (D.C. Cir. 1983). Pub. L. 114–222 § 2, 130 Stat. 852, 852 (2016). While *Halberstam* does not deal specifically with the Anti-Terrorism Act, the Second Circuit's ATA decision in *Linde v. Arab Bank, PLC* applied the *Halberstam* factors to an ATA action for the first time since JASTA was enacted. 882 F.3d 312, 329 (2018). As set forth by *Halberstam,* and reinforced by *Linde,* aiding and abetting liability requires proof of three elements:

    (1) "the party whom the defendant aids must perform a wrongful act that causes an injury,"

    (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and

    (3) "the defendant must knowingly and substantially assist the principal violation."

*Halberstam,* 705 F.2d at 487; *Linde,* 882 F.3d at 329.

The allegations in Plaintiffs' Third Amended Complaint at Law sufficiently allege aiding and abetting liability according to the standard designated by Congress and set forth in

*Halberstam* and *Linde*. Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) therefore must be denied.

### A.  Defendants aided *AQI,* who performed a wrongful act which caused injury to Plaintiffs and Plaintiffs' decedents.

It is undisputed that *AQI* performed a wrongful act that caused injury and death to Plaintiffs and Plaintiffs' decedents. As such, the Plaintiffs' Third Amended Complaint properly alleges the first element of aiding and abetting liability as set forth in *Halberstam* and *Linde*.

*AQI* carried out the attacks which resulted in the injuries and deaths of Plaintiffs and Plaintiffs' decedents. (ECF 103 at ¶ 4). As set forth in more detail below, the Defendants deliberately engaged in a scheme to falsify financial transaction information in order to continue doing business with Al Rajhi Bank and other institutions that had connections to terrorist financing. By knowingly and willingly continuing to do business with Al Rajhi Bank, the Defendants gave *AQI* the access to the U.S. financial system and U.S. Dollars that it needed to carry out its acts of terror, including the November 5, 2009 bombing in Amman. (ECF 103 at ¶ 39). *AQI* used the funds from Defendants to support, encourage, entice, and make possible the November 9, 2005 bombing in Amman which killed and injured hundreds, including Plaintiffs and Plaintiffs' decedents. (*Id.* at ¶ 40, 41). But for the HSBC Defendants, *AQI* would not have had the access to the United States financial system and could not have planned, funded, or performed the heinous attacks on November 5, 2009 in Amman. (*Id.* at ¶ 9, 40, 41).

### B.  The Defendants were generally aware of their role as part of an overall illegal activity at the time they were providing assistance.

The second element of aiding and abetting liability set out by *Halberstam* and *Linde* requires that "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." *Linde,* 882 F.3d at 329. Aiding and

abetting "requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." *Id. quoting Halberstam,* 705 F.2d at 477. Such awareness does not require "proof of the specific intent demanded for criminal aiding and abetting culpability, *i.e.,* defendant's intent to participate in a criminal scheme as 'something that he wishes to bring about and seek by his action to make it succeed.'" *Id. quoting Rosemond v. United States,* 134 S. Ct. 1240, 1242 (2014). The requisite awareness also does not require that the defendant knew of the specific attacks at issue when it provided financial services. *Id.* Instead, what a jury would ultimately have to find is that in providing financial services, the bank was "generally aware" that it was thereby playing a "role" in the violent or life-endangering activities. *Id.*

Defendants were well aware that they were playing a role in overall illegal, tortious, and life-endangering activity at the time they were supplying funds to *AQI.* For decades, Defendants, despite being aware of the terrorist financing risks in the Middle East, and, in particular, Saudi Arabia, had been banking in the area and providing Saudi Arabia's largest private financial institution, Al Rajhi Bank, with access to the U.S. financial system. (ECF 103 at ¶ 32). In fact, according to HSBC records, HSBC supplied U.S. dollars to Al Rajhi Bank for more than twenty-five (25) years. (*Id.* at ¶ 108). HBUS opened a banknotes account for Al Rajhi Bank in January 2001, and the U.S. dollars were physically delivered to Al Rajhi Bank in Saudi Arabia. (*Id.*). It's clear that HSBC knew of these ties to terrorism because while Al Rajhi Bank was its client, HSBC classified Al Rajhi Bank as a "Special Category of Client," its highest risk designation. (*Id.* at ¶ 109). Al Rajhi Bank was one of only a handful of bank clients that HSBC had classified as "Special Category of Client." (*Id.*). HSBC even described many of the alleged links to terrorist financing in the Al Rajhi Bank client profile. (*Id.* at ¶ 113).

While the attack at issue here occurred in 2005, the Defendants' awareness of Al Rajhi Bank's ties to terrorist organizations began as far back as 2001. As clearly alleged in Plaintiffs' Third Amended Complaint, the Defendants were aware, prior to November 9, 2005, of the following connections between Al Rajhi Bank and terrorism:

- Since as early as 2001, Defendants knew that Al Rajhi Bank and its owners provided accounts to clients linked with terrorism (to wit, the *al-Haramain Islamic Foundation* and *Soliman Al-Buthe,* both designated by the U.S. as linked to terrorism, and the *International Islamic Relief Organization* which is known for "facilitating fundraising for *al-Qaeda*"), and provided crucial material support to *AQI*. (*Id.* at ¶ 36).

- Following the terrorist attacks on the United States on September 11, 2001, the U.S. government began an intensive investigation into where and how terrorists obtain funding, repeatedly returning to Saudi Arabia, its banks, and its nationals as a suspected source. (*Id.* at ¶ 92).

- In 2004, the 9/11 Commission charged with investigating the terrorist attack issued a report which stated that "Saudi Arabia's society was a place where al Qaeda raised money directly from individuals and through charities. It was the society that produced 15 of the 19 hijackers." (*Id.* at ¶ 93).

- Al Rajhi Bank gained notoriety for providing banking services to several of the hijackers in the 9/11 terrorist attack, including Abdulaziz al Omari who was aboard American Airlines Flight 11. Al Omari frequently utilized a credit card drawn on Al Rajhi Bank in the planning of the attacks. On September 7, 2001, four days before the 9/11 attacks, al Omari received a wire transfer from Al Rajhi Bank. (*Id.* at ¶ 94).

- In March 2002, a search of the Bosnian offices of the Benevolence International Foundation, a Saudi based nonprofit organization which was also designated a terrorist organization by the U.S. Treasury Department, led to seizure of a CD-ROM and computer hard drive with numerous al Qaeda documents. One computer file contained scanned images of several hundred documents chronicling the formation of al Qaeda. One of the scanned documents contained a handwritten list of twenty (20) individuals identified as key financial contributors to al Qaeda. Osama bin Laden referred to that group of individuals as the "Golden Chain." One of the twenty (20) handwritten names in the Golden Chain document identifying al Qaeda's early key financial benefactors is Sulaiman bin Abdul Aziz Al Rajhi, one of Al Rajhi Bank's key founders and most senior officials. (*Id.* at ¶¶ 96-7).

- The Golden Chain document has been discussed in the 9/11 Commission report, in Federal Court filings, and civil lawsuits. Media reports as early as March of 2003 noted that Al Rajhi's name was included on the Golden Chain list, and that U.S. intelligence

10

and law-enforcement agencies have studied connections between the Al Rajhi family and its bank to al Qaeda through corporate and bank records. More than two years prior to November 9, 2005, HSBC was clearly on notice of both the Golden Chain list of financial benefactors to al Qaeda, and Sulaiman bin Abdul Aziz Al Rajhi's place on the list, yet they continued to provide U.S. dollars and banking services to Al Rajhi Bank. (*Id.* at ¶ 98).

- In March 2002, as part of Operation Green Quest, a U.S. Treasury effort to disrupt terrorist financing activities in the United States, U.S. law enforcement agents conducted a search of 14 interlocking business and nonprofit entities in Virginia associated with the SAAR Foundation, an Al Rajhi-related entity, and the Al-Rajhi family. A law enforcement affidavit supporting the search warrant detailed numerous connections between the targeted entities and Al Rajhi family members and related ventures. The affidavit stated that over 100 active and defunct nonprofit and business ventures in Virginia were part of what it described as the "Safa Group," which the United States had reasonable cause to believe was "engaged in the money laundering tactic of 'layering' to hide from law enforcement authorities the trail of its support for terrorists." An affidavit filed by the United States in support of the search warrant alleged that the Safa Group appeared to be involved with providing material support to terrorism. Among other matters, it alleged that members of the Safa Group had transferred "large amounts of funds . . . directly to terrorist-front organizations since the early 1990's." According to the affidavit, "one source of funds flowing through the Safa Group [was] from the wealthy Al-Rajhi family in Saudi Arabia. Over 150 law enforcement officers participated in the 2002 search, generating widespread media coverage of the Safa Group's, and Al Rajhi Bank's, ties to terrorist financing. Despite this knowledge, HSBC continued to do business with Al Rajhi Bank. (*Id.* at ¶¶ 99-101).

- As early as 2002, the Wall Street Journal ran an article describing how Saudi Arabia was monitoring Al Rajhi Bank accounts for terrorism. (*Id.* at ¶ 102).

- In 2002, Douglas Stolberg, the head of Commercial and Institutional Banking at HBUS authored an email to a senior HBUS executive which noted that the there were concerns regarding the ongoing maintenance of accounts for Al Rajhi. The email also stated, "this has become a fairly high profile situation. **Compliance's concerns relate to the possibility that Al Rajhi's account may have been used by terrorists. If true, this could potentially open HBUS up to public scrutiny and/or regulatory criticism."** (*Id.* at ¶ 110) (emphasis added).

- A 2003 United States Central Intelligence Agency report classified Al Rajhi Bank as a conduit for extreme terrorist financing. The report stated:

  > Islamic extremists have used Al Rajhi Banking & Investment Corporation since at least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound. Senior Al

11

> Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank. Reporting indicates that senior Al Rajhi family members control the bank's most important decisions. The Al Rajhis know they are under scrutiny and have moved to conceal their activities from financial regulatory authorities. (*Id.* at ¶¶ 34, 103).

- In 2005, it became public that Soliman Al-Buthe, a designated terrorist financer, had been a client of Al Rajhi Bank in Saudi Arabia, as had the foreign terrorist organization al-Haramain Islamic Foundation. (*Id.* at ¶ 104).

- Al Rajhi Bank was associated with Islami Bank Bangladesh Ltd., which was located in a country at high risk for money laundering, provided an account to a Bangladeshi accused of involvement with a terrorist bombing, and had been fined three times for violating AML requirements in connection with providing bank services to militants. HSBC was aware of their client's involvement, as HSBC's own research indicated that the Al Rajhi group held about one-third of the bank's shares. Despite this knowledge, HSBC continued to provide Al Rajhi Bank with U.S. dollars and access to the United States financial system. (*Id.* at ¶ 105).

- In 2003, HSBC's internal Financial Intelligence Group (FIG) raised questions about the International Islamic Relief Organization (IIRO). Until at least December 2004, the IIRO arranged for donors to send donations directly to accounts it held at Al Rajhi Bank, advertising the accounts in various publications. The IIRO has been linked to al Qaeda and other terrorist groups, plots to assassinate President Bill Clinton and the Pope, attacks on the Brooklyn Bridge and Lincoln Tunnel, and the 1993 attack on the World Trade Center. Al Rajhi Bank and Sulaiman bin Abdul Aziz Al Rajhi himself had ties to the IIRO. Despite their questions about the IIRO, HSBC continued to do business with Al Rajhi Bank. (*Id.* at ¶ 106).

- In 2004, the United States designated as terrorist organizations several Saudi-based nonprofit organizations that were also clients of Al Rajhi Bank. (*Id.* at ¶ 107).

Despite their knowledge of all of these ties to international terrorism, the Defendants continued to do business with Al Rajhi Bank. They were aware of their role as they provided, and continued to provide, terrorist organizations like *AQI* with U.S. dollars. (*Id.* at ¶¶ 95, 98, 101, 105, 106, 107).

In fact, in January 2005, HSBC Group Compliance decided that its U.S.-based businesses should sever ties with Al Rajhi Bank due to terrorist financing concerns. (*Id.* at ¶ 111). However,

HSBC reversed itself in May, only four months later, instead allowing each affiliate to choose for themselves whether or not to continue doing business with Al Rajhi Bank. (*Id.*).

Taken together, the Al Qaeda Golden Chain document, the 9/11 Commission report, the 2002 search of Al Rajhi-related entities in Virginia, the 2003 CIA report, countless government, news, and media reports, and HSBC's own records present an unusual array of troubling allegations about a particular financial institution. (*Id.* at ¶ 112). Through all of these sources, and most persuasively the Defendants' own records and designations, it's clear that HSBC was fully aware that Al Rajhi Bank and its owners were associated with terrorist financing and had connections to countless terrorist organizations. (*Id.* at ¶ 113). Despite this knowledge, HBUS did not close its banknotes account with Al Rajhi Bank until October 2010. (*Id.* at ¶ 108). Despite this knowledge, the Defendants chose to provide Al Rajhi Bank with banking services and therefore knowingly assisted *AQI* in acquiring the U.S. dollars it needed to carry out its acts of terror in Amman. (*Id.* at ¶ 113).

### C. The Defendants knowingly and substantially assisted *AQI* in carrying out the November 5, 2009 bombings in Amman.

According to the *Halberstam* and *Linde* courts, there are six factors relevant to determining "how much encouragement or assistance is substantial enough" to satisfy the third element. Those factors are: (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance. *Linde,* 882 F.3d at 329; *Halberstam,* 705 F.2d at 483-84. These factors support a finding that Plaintiffs' Third Amended Complaint meets the requirements of the third element.

13

In order to continue doing business with clients that were associated with terrorist organizations, including *AQI*, the Defendants *agreed* to alter, falsify, or omit information from payment messages so that the transactions would not be delayed or blocked by OFAC filters when they were sent to accounts at HBUS. (*Id.* at ¶¶ 64, 66, 79). Specifically, the Defendants stripped information from wire transfer documentation in order to conceal the participation of prohibited countries or persons, or characterized transactions as transfers between banks in approved jurisdictions while omitting underlying payment details that would disclose participation of a prohibited originator or beneficiary. (*Id.* at ¶ 80). HSBC Compliance was aware of this conduct, yet they did not take any actions to stop it. (*Id.* at ¶¶ 83, 84).  Instead, the Defendants continued to undertake various methods to facilitate these prohibited transactions. (*Id.* at ¶ 84).

The sheer volume of these illicit transactions is remarkable. An outside auditor hired by HBUS itself identified that from 2001-2007, more than 28,000 undisclosed, OFAC sensitive transactions were sent through HBUS. (*Id.* at ¶ 86). These transactions amounted to 19.7 billion dollars. (*Id.*). Specifically, Defendants provided Al Rajhi Bank with nearly $1 billion U.S. dollars in the twenty-five years they did business with the Saudi Arabian bank. (*Id.* at ¶¶ 108, 114).

The Defendants' conscious choice to continue to provide these funds to Al Rajhi Bank provided *AQI* with exactly what it so desperately desired - access to the U.S. financial system so they could use U.S. Dollars to finance their attacks on U.S. targets. (*Id.* at ¶ 115). Each individual attack, including the November 9, 2005 bombing in Amman, Jordan, was a great expense to *AQI*. (*Id.* at ¶ 30). Each attack required an array of costs, including paying group members and the

14

families of the imprisoned and deceased, securing and maintaining safe houses, and transporting material and members.

The Defendants knew that the transactions they maintained, established, facilitated, and controlled were used to support, encourage, entice and make possible terrorist attacks. (*Id.* at ¶ 117). The Defendants knowingly established, maintained and administered a highly organized scheme to circumvent United States regulations in order to make financial payments to the terrorist group *AQI* possible. (*Id.* at ¶ 117).

<u>**CONCLUSION**</u>

Plaintiffs have sufficiently set forth allegations of aiding and abetting liability under the Anti-Terrorism Act which, taken as true and considered in the light most favorable to Plaintiffs, raise much more than a sheer possibility that Defendants have acted unlawfully, as required by federal pleading standards. For this reason, Defendants' 12(b)(6) Motion to Dismiss must be denied.

WHEREFORE Plaintiffs respectfully request that this Court enter an Order denying Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint at Law.

/s/ William T. Gibbs
_____

William T. Gibbs
Corboy & Demetrio, P.C.
Attorney for Plaintiffs
33 North Dearborn Street, 21st Floor
Chicago, Illinois  60602
(312) 346-3191
Firm I.D. No. 108

## <u>CERTIFICATE OF SERVICE</u>

I, William T. Gibbs, hereby certify that on April 27, 2018, I electronically filed a true and correct copy of Plaintiffs' Response to Defendants' Motion to Dismiss through the CM/ECF system for the United States District Court for the Southern District of New York, which will send a notice of electronic filing to all counsel of record and make it available for viewing and downloading from the CM/ECF system.


/s/ William T. Gibbs
_____


William T. Gibbs
Corboy & Demetrio, P.C.
Attorney for Plaintiffs
33 North Dearborn Street, 21st Floor
Chicago, Illinois  60602
(312) 346-3191
Firm I.D. No. 108

1