18-2540-cv
*Jeffrey Siegel, et al. v. HSBC North America Holdings, Inc., and HSBC Bank USA, N.A.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2018

(Argued: March 5, 2019   Decided: August 8, 2019)

Docket No. 18-2540-cv

────────────────

JEFFREY SIEGEL, ADMINISTRATOR OF THE ESTATE OF MOUSTAPHA AKKAD, DECEASED,
AND MOUSTAPHA AKKAD'S HEIRS, SOOHA AKKAD, INDIVIDUALLY, SUSAN GITELSON,
SPECIAL ADMINISTRATOR OF THE ESTATE OF RIMA AKKAD MONLA, DECEASED, AND
RIMA AKKAD MONLA'S HEIRS, ZIAD MONLA, AND MICHAEL BUTLER,
*Plaintiffs-Appellants*,

v.

HSBC NORTH AMERICA HOLDINGS, INC., AND HSBC BANK USA, N.A., HBUS,
*Defendants-Appellees*.[1]

────────────────

Before:      SACK, RAGGI, AND CARNEY, *Circuit Judges*.

The plaintiffs are victims, or the representatives of victims, of a series of

terrorist attacks on November 9, 2005, in Amman, Jordan.  The plaintiffs allege

that the defendants, HSBC North America Holdings, Inc., and HSBC Bank USA,

N.A., aided and abetted the attackers, in violation of the Justice Against Sponsors

───────────

[1] The Clerk of Court is directed to amend the official caption to conform with the
caption above.

of Terrorism Act, 18 U.S.C. § 2333(d), by providing banking services to Al Rajhi

Bank, Saudi Arabia's largest commercial bank, which was thought by some to

have ties to al-Qaeda in Iraq, the terrorist organization responsible for the

November 9 attacks. The district court (Denise L. Cote, *Judge*) granted the

defendants' motion to dismiss for failure to state a claim, concluding that the

plaintiffs had failed to plausibly allege that the defendants knowingly aided or

abetted the November 9 attacks. We agree. We therefore AFFIRM.

> WILLIAM T. GIBBS, Corboy & Demetrio, Chicago, IL, *for Plaintiffs-Appellants.*
>
> ANDREW JOHN PINCUS, Mayer Brown LLP, Washington, DC (Mark G. Hanchet and Robert W. Hamburg, Mayer Brown LLP, New York, NY, *on the brief*), *for Defendants-Appellees.*
>
> Marc J. Gottridge, Hogan Lovells US LLP, New York, NY (Lisa J. Fried, Benjamin A. Fleming, *on the brief*), filed a brief for The Institute of International Bankers, *et al.*, as *Amici Curiae.*

SACK, *Circuit Judge*:

The plaintiffs are victims, or representatives of victims, of a series of

terrorist attacks on November 9, 2005, in Amman, Jordan. They sued the

defendants, HSBC Bank USA, N.A. and HSBC North America Holdings, Inc., for

violating the Antiterrorism Act of 1990 ("ATA"), 18 U.S.C. § 2333, as amended by

the Justice Against State Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 144-222, 130 Stat. 852 (Sept. 28, 2016), by providing financial services to Al Rajhi Bank, a prominent Saudi bank alleged to have links to terrorist organizations, including al-Qaeda in Iraq, the terrorist organization responsible for the November 9 attacks.  The plaintiffs now appeal from a judgment of the United States District Court for the Southern District of New York (Denise L. Cote, *Judge*) dismissing this action for failure to state a claim.  The plaintiffs argue that the defendants' willingness to do business with Al Rajhi Bank despite their knowledge of its links to terrorism is sufficient to expose the defendants to aiding-and-abetting liability under JASTA.  They are wrong.  Like the district court, we conclude that because the plaintiffs did not adequately allege in their operative pleading, the Third Amended Complaint (the "TAC"), that the defendants knowingly played a role in the November 9 attacks or provided substantial assistance to the terrorist organization that perpetrated it, they failed to state a plausible claim for relief under JASTA.  We therefore affirm the judgment of the district court.

# BACKGROUND

*Factual Background*[2]

On November 9, 2005, suicide bombers attacked three hotels in Amman, Jordan, in a series of coordinated attacks (the "November 9 Attacks" or "Attacks").  The terrorist organization al-Qaeda in Iraq ("AQI") claimed responsibility.  With support from al-Qaeda, AQI selected the Attacks' targets, recruited and trained the suicide bombers, constructed the bombs, and transported the bombs into Jordan.

The plaintiffs are Americans who were injured, or the heirs or administrators of the estates of those killed, in the Attacks.  The defendants, HSBC North America Holdings, Inc. ("HSNA") and HSBC Bank USA, N.A. ("HBUS," and together with HSNA, "HSBC"), are financial institutions.  Each has its principal place of business in New York.  HSNA is a financial institution holding-company and the parent company of HBUS.  Unlike HSNA, HBUS

---

[2] The facts set forth in this Opinion are drawn from the TAC, as well as the United States Senate Permanent Subcommittee on Investigations' 2012 Report entitled, "U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing," which the plaintiffs incorporated into the TAC.  "For Rule 12(b)(6) purposes, the complaint includes any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Coalition for Competitive Electricity, Dynergy Inc. v. Zibelman*, 906 F.3d 41, 49 (2d Cir. 2018) (internal quotation marks and brackets omitted).

4

provides banking services directly to individual customers.  Until January 2005,

HBUS maintained a commercial relationship with Al Rajhi Bank ("ARB"), Saudi

Arabia's largest bank, with approximately $80 billion in assets and more than 500

branches worldwide.

The plaintiffs allege the following:[3]

ARB was, at all relevant times, involved in financing terrorist activity.  In

2002, one of ARB's senior officials appeared on a list of investors who supported

al-Qaeda, and *The Wall Street Journal* reported that the government of Saudi

Arabia was monitoring ARB accounts for links to terrorist organizations.  In

2003, the United States Central Intelligence Agency referred to ARB as a "conduit

for terrorist transactions."  STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS,

U.S. VULNERABILITIES TO MONEY LAUNDERING, DRUGS, AND TERRORIST

FINANCING: HSBC CASE HISTORY 197 (July 17, 2012) [hereinafter HSBC CASE

HISTORY] (quoting 2003 report by the Central Intelligence Agency entitled, "Al

Rajhi Bank: Conduit for Extremist Finance").  In 2004, the United States

---

[3] Although the defendants dispute certain allegations, we accept them as true for the purposes of reviewing the challenged judgment of dismissal, except where wholly conclusory as noted *infra* at pp. 16–20.  *See In re Facebook, Inc., Initial Public Offering Derivative Litig.*, 797 F.3d 148, 159 (2d Cir. 2015) (quoting *Faber v. Met. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011)).

government designated several Saudi-based non-profit organizations—all clients

of ARB—as terrorist organizations. And in February 2005, two persons

unaffiliated with HSBC were indicted, charged with cashing $130,000 in travelers

checks at an ARB branch in Saudi Arabia and sending the money to suspected

terrorists in Chechnya.

HSBC was aware of ARB's links to terrorist organizations. The plaintiffs

quote a 2012 report issued by the United States Senate Permanent Subcommittee

on Investigations. It states in relevant part:

> HSBC has been active in Saudi Arabia, conducting
> substantial banking activities through affiliates as well
> as doing business with Saudi Arabia's largest private
> financial institution, Al Rajhi Bank. After the 9/11
> terrorist attack in 2001, evidence began to emerge that
> Al Rajhi Bank and some of its owners had links to
> financing organizations associated with terrorism,
> including evidence that the bank's key founder was an
> early financial benefactor of al Qaeda.

TAC ¶ 63 (quoting HSBC CASE HISTORY 5-7 (brackets and internal quotation

marks omitted)). Also, in 2002, the HBUS officer in charge of Commercial and

Institutional Banking stated in an email to a colleague that HBUS's relationship

with ARB had become "fairly high profile" and that compliance officers within

the company were concerned "that Al Rajhi's account may have been used by

terrorists," which, "[i]f true, . . . could potentially open HBUS up to public

6

scrutiny and/or regulatory criticism." *Id.* at ¶ 110 (quoting email from Douglas

Stolberg, Commercial and Institutional Banking Div., HBUS, to another senior

HBUS official (2002)).  In 2003, HSBC's Financial Intelligence Group raised

concerns about one of ARB's clients that had been linked to al-Qaeda.

Despite HSBC's knowledge of ARB's support of terrorist organizations,

HSBC "provided [ARB] with a wide range of banking services," including "wire

transfers, foreign exchange, trade financing, and asset management services."

TAC ¶ 90.  HSBC also "agree[d] to alter, falsify, or omit information from

payment messages that involved prohibited countries and institutions" in order

to "conceal[] financial activities and transactions from detection . . . by U.S.

regulators, law enforcement, and/or depository institutions."  *Id.* at ¶ 64.  HSBC's

compliance officers were aware that ARB "strip[ped] information from wire

transfer documentation" but "did not take decisive action to stop the conduct or

inform HBUS of the extent of the activity."  *Id.* at ¶¶ 80, 83, 84.  Instead, HSBC

"continued to undertake various methods to facilitate payments to prohibited

persons or institutions," including by "characteriz[ing] . . . transaction[s] as . . .

transfer[s] between banks in . . . approved jurisdiction[s], while omitting

underlying payment details that would disclose participation of a prohibited

originator or beneficiary." *Id.* at ¶¶ 80, 84. HSBC continued to do business with ARB until January 2005, approximately ten months before the Attacks, when it "decided that its U.S.-based businesses should sever ties with [ARB] due to terrorist financing concerns." *Id.* at ¶¶ 108, 111.

HSBC's participation in a "scheme" to evade U.S. regulators until January 2005 "made it possible for [ARB] and other prohibited financial institutions to transfer . . . hundreds of millions of dollars in U.S. currency through the U.S. in a manner designed to . . . circumvent monitoring by U.S. regulators" and then to transfer those funds "to AQI, al-Qaeda, and other terrorist organizations actively engaged in plotting attacks against the United States and its citizens." TAC ¶ 65. HSBC "provided [ARB] with the means . . . [to] transfer millions of U.S. dollars to AQI, which were actively engaged in planning and perpetrating the murder and maiming of Americans, including the victims of the [November] 2005 bombings in Amman." *Id.* at ¶ 70. By helping to "conceal billions of U.S. dollars passing through the U.S. financial system from detection, scrutiny, or monitoring," it participated in a "scheme" that constituted a "substantial cause . . . in the chain of events leading to the Plaintiffs' injuries." *Id.* at ¶¶ 66, 69.

*Jeffrey Siegel, et al. v. HSBC North America Holdings, Inc., and HSBC Bank USA, N.A.*

In December 2012, HBUS entered into a deferred prosecution agreement with the United States Department of Justice in which it "admitted to [anti money-laundering] sanctions violations" and agreed to forfeit $1.256 billion, as well as pay $665 million in civil penalties.  TAC ¶¶ 87, 88 (citing Press Release, U.S. Dep't of Justice, HSBC Holdings PLC and HSBC Bank USA N.A. Admit to Anti-Money Laundering and Sanctions Violations, Forfeit $1.256 Billion in Deferred Prosecution Agreement ("DOJ Press Release") (December 11, 2012), https://www.justice.gov/opa/pr/hsbc-holdings-plc-and-hsbc-bank-usa-na-admit-anti-money-laundering-and-sanctions-violations).  In its press release announcing the agreement, the government asserted that "[u]sing their scheme to evade [the Office of Financial Assets Control's] filters by stripping identifying information from transfers, [HSBC] provided [ARB] with a wide range of banking services . . . , includ[ing] U.S. Dollars, wire transfers, foreign exchange, trade financing, and asset management services," *id.* at ¶ 90, which "flout[ed] . . . U.S. sanctions laws and regulations," *id.* at ¶ 89 (quoting December 11, 2012 statement by Loretta Lynch, then-United States Attorney for the Eastern District of New York, in DOJ Press Release).

*Jeffrey Siegel, et al. v. HSBC North America Holdings, Inc., and HSBC Bank USA, N.A.*

*Procedural History*

The plaintiffs originally filed this action in the United States District Court for the Northern District of Illinois.  They pleaded claims against HBUS, HSNA, HSBC Holdings, PLC, HSBC Bank Middle East Limited, and ARB.  On August 14, 2017, that district court (John Robert Blakey, *Judge*) dismissed the plaintiffs' claims against defendants HSBC Holdings, PLC, HSBC Bank Middle East Limited, and ARB without prejudice for lack of personal jurisdiction.  *See Siegel v. HSBC Holdings, PLC*, 283 F. Supp. 3d 722, 733-34 (N.D. Ill. 2017).

On January 19, 2018, after the case was transferred to the Southern District of New York, the district court dismissed with prejudice all claims against HSBC Holdings, PLC and ARB for lack of personal jurisdiction.  *See Siegel v. HSBC Holdings, PLC*, No. 17 Civ. 6593 (DLC), 2018 WL 501610, at *4, 2018 U.S. Dist. LEXIS 8986, at *9-12 (S.D.N.Y. Jan. 19, 2018).  On July 27, 2018, the district court granted HSBC's motion to dismiss the plaintiffs' claim against it for failure to state a claim.  *See Siegel v. HSBC Bank USA, N.A.*, No. 17 Civ. 6593 (DLC), 2018 WL 3611967, at *5, 2018 U.S. Dist. LEXIS 126152, at *10-13 (S.D.N.Y. July 27, 2018).

*Jeffrey Siegel, et al. v. HSBC North America Holdings, Inc., and HSBC Bank USA, N.A.*

# DISCUSSION

The plaintiffs assert that the allegations in their TAC suffice to state a claim against HSBC for aiding and abetting AQI in perpetrating the November 9 Attacks. They contend that the scope of liability under JASTA is broad enough to include instances, such as the one here, where a defendant provides indirect support to a terrorist organization. HSBC argues in response that only direct support to terrorist organizations is actionable under JASTA. It further asserts that, even if that were not so, the plaintiffs' aiding-and-abetting claim would still fail because the plaintiffs have failed adequately to allege the requisite elements of such a cause of action.

We conclude that the plaintiffs' aiding-and-abetting claim fails as a matter of law because the plaintiffs have not plausibly alleged that HSBC assumed a role in the November 9 Attacks or provided substantial assistance to AQI. We therefore affirm the judgment of the district court.

## I.   Standard of Review

"We review *de novo* a district court's dismissal of a complaint under Rule 12(b)(6), accepting all of the complaint's factual allegations as true and drawing all reasonable inferences in the plaintiffs' favor." *Giunta v. Dingman*, 893 F.3d 73,

78-79 (2d Cir. 2018).  However, "[w]e are 'not . . . bound to accept conclusory

allegations or legal conclusions masquerading as factual conclusions.'"  *In re*

*Facebook, Inc., Initial Public Offering Derivative Litig.*, 797 F.3d 148, 159 (2d Cir.

2015) (quoting *Faber v. Met. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011)).

## II.   Applicable Law

The ATA creates a cause of action for United States nationals who are

"injured in [their] person, property, or business by reason of an act of

international terrorism."  18 U.S.C. § 2333(a).  For purposes of and according to

the ATA, "international terrorism" includes "activities that (A) involve violent

acts or acts dangerous to human life that . . . would be a criminal violation if

committed within the jurisdiction of the United States or of any State" and that

"(B) appear to be intended (i) to intimidate or coerce a civilian population; (ii) to

influence the policy of a government by intimidation; or (iii) to affect the conduct

of a government by mass destruction, assassination, or kidnapping."  *Id.*

§ 2331(1)(A)–(B).  In its original form, the ATA afforded relief only against the

perpetrators of the terrorist attacks, not against secondary, supporting actors.  *See*

*Linde v. Arab Bank, PLC*, 882 F.3d 314, 319 (2d Cir. 2018).

12

In 2016, Congress enacted JASTA, which expanded the ATA's reach to apply not only to those who perpetrate terrorist attacks but also to those who aid and abet, or conspire with, the principals. *See id.* at 320. By its terms, JASTA applies to "any person who aids and abets, by knowingly providing substantial assistance [to], or who conspires with the person who committed[,] such an act of international terrorism." 18 U.S.C. § 2333(d)(2). JASTA's secondary-liability provision applies to any civil action "(1) pending on, or commenced on or after, the date" of JASTA's enactment, and "(2) arising out of an injury . . . on or after September 11, 2001." *Id.* at Statutory Notes (quoting JASTA, § 7, 130 Stat. at 855). Congress's purpose in enacting JASTA was "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries" that "have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." *Id.* (quoting JASTA, § 2(b), 130 Stat. at 853).

JASTA further states that *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), provides "the proper legal framework" for "[f]ederal civil aiding and abetting and conspiracy liability." *Id.* (quoting JASTA, § 2(a)(5), 130 Stat. at 852). In

13

*Halberstam*, the D.C. Circuit concluded that aiding-and-abetting includes three elements: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury;" (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance;" and (3) "the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477.

## III.    Application

The parties do not dispute that the November 9 Attacks constitute acts of "international terrorism," as defined by the ATA, or that AQI perpetrated the Attacks. They similarly do not dispute that congressional and media reports issued before November 2005 stated that ARB supported terrorist organizations, including AQI, and that HSBC had provided banking services to ARB for more than twenty-five years before terminating its relationship with ARB in January 2005, ten months before the November 9 Attacks.

Rather, the parties dispute the scope of JASTA liability. Plaintiffs advance an expansive theory of JASTA liability under which indirect support to a terrorist organization is actionable—including where, as alleged here, a bank provides routine banking services to a foreign, unaffiliated financial institution that

14

provides support to a terrorist organization.  By contrast, HSBC contends that

JASTA applies only to the provision of direct support to terrorist organizations.[4]

We need not here decide whether JASTA's reach is as limited as HSBC

suggests[5] because the plaintiffs' claim fails even under their more expansive

interpretation of the statute.  Specifically, the plaintiffs have failed to allege

adequately two of the three *Halberstam* elements of civil aiding-and-abetting:

(1) that HSBC was "generally aware" of its role as part of an "overall illegal or

tortious activity at the time that [it] provide[d] the assistance," and (2) that HSBC

"knowingly and substantially assist[ed] the principal violation."  *Halberstam*, 705

F.2d at 477.

In order to plead adequately the "general-awareness" element, a plaintiff

must plausibly allege that the defendant was "aware that, by assisting the

---

[4] *See* Appellees Br. 2 ("By its plain language, JASTA aiding and abetting lies only where a defendant knowingly provides substantial assistance *to the person who committed such an act of international terrorism*.  Here, that is terrorist operatives from AQI."); *see also id.* at 20 ("Absent a direct connection between the defendant and the person who committed the terrorist act, there is no liability under JASTA.").

[5] We note, however, that the statute does not, by its terms, limit aiding-and-abetting liability to those who provide direct support to terrorist organizations, and Congress wrote that its purpose in enacting the statute was "to provide civil litigants with the *broadest possible basis*" to seek relief against those who "have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States."  18 U.S.C. § 2333 Statutory Notes (quoting JASTA, § 2(b), 130 Stat. at 853) (emphases added).

principal, it is itself assuming a role in terrorist activities." *See Linde*, 882 F.3d at 329 (internal quotation marks omitted). In *Linde*, we explained that although "[s]uch awareness does not require proof of . . . specific intent" or knowledge "of the specific attacks at issue," it does require that "the bank was generally aware that[, by providing financial services to a client,] it was thereby playing a 'role' in [the] violent or life-endangering activities." *Id.* We contrasted this with "the *mens rea* required to establish material support in violation of 18 U.S.C. § 2339B, which requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities." *Id.* at 329-30.

Here, the plaintiffs have failed to allege that HSBC was aware that by providing banking services to ARB, it was supporting AQI, much less assuming a role in AQI's violent activities. At most, the allegations, even when viewed in the light most favorable to the plaintiffs, assert that HSBC was aware that ARB was believed by some to have links to AQI and other terrorist organizations.[6] Without further allegations that would support a conclusion that HSBC

---

[6] *See, e.g.*, TAC ¶¶ 34-35 (identifying various public reports that ARB and some of its senior officials supported terrorist organizations, including al-Qaeda); *id.* at ¶ 63 (quoted *supra* at p. 6); *id.* at ¶ 110 (quoted *supra* at pp. 6–7).

knowingly played a role in the terrorist activities, the TAC pleadings are insufficient to state a claim for aiding-and-abetting liability under JASTA. *See Linde*, 882 F.3d at 329 (stating that "aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*" (emphasis in original)).

Instead, the plaintiffs' allegations themselves suggest that in providing banking services to ARB, HSBC had little reason to suspect that it was assuming a role in AQI's terrorist activities. The plaintiffs acknowledge that ARB is a large bank with vast operations. *See* TAC ¶ 33 (ARB is "Saudi Arabia's largest private bank, holding $80 billion in assets . . . [with] over 500 branches—mostly in Saudi Arabia, but also in Malaysia, Kuwait, and Jordan"). They do not allege that most, or even many, of ARB's banking activities are linked to terrorists. Nor do they offer any non-conclusory allegations that HSBC provided banking services for any transactions relating to the November 9 Attacks.

And crucially, the plaintiffs concede that, in January 2005—ten months before the November 9 Attacks—HSBC ceased doing business with ARB altogether. HSBC's decision not to provide banking services to ARB for the ten months preceding the November 9 Attacks makes it implausible under the

circumstances that HSBC had knowingly assumed a role in the Attacks.

Although the plaintiffs allege generally that HSBC "participated in [a] scheme" to

assist ARB in "circumvent[ing] monitoring by U.S. regulators," TAC ¶¶ 65-66,

and thereby "provided nearly $1 billion in U.S. dollars to [ARB]," *id.* at ¶ 114,

they fail to advance any plausible, factual, non-conclusory allegations that HSBC

knew or intended that those funds would be sent to AQI or to any other terrorist

organizations.  This forecloses their JASTA claim.  *Cf. Rothstein v. UBS AG*, 708

F.3d 82, 94 (2d Cir. 2013) ("'A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged.'" (quoting *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009))).

The plaintiffs have also failed adequately to plead the "substantial

assistance" element of aiding-and-abetting liability under JASTA.  Six factors are

relevant to demonstrating "substantial assistance": "(1) the nature of the act

encouraged, (2) the amount of assistance given by defendant, (3) defendant's

presence or absence at the time of the tort, (4) defendant's relation to the

principal, (5) defendant's state of mind, and (6) the period of defendant's

assistance."  *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 483-84).

The plaintiffs here have not plausibly alleged that HSBC encouraged the heinous November 9 Attacks or provided any funds to AQI.  To be sure, the plaintiffs did allege that HSBC provided hundreds of millions of dollars to ARB, but they did not advance any non-conclusory allegation that AQI received any of those funds or that HSBC knew or intended that AQI would receive the funds.  As for the third factor, as the plaintiffs themselves allege, HSBC was not "present" at the time of the November 9 Attacks.  Indeed, HSBC had ceased transacting *any* business with ARB ten months prior.  On the fourth factor—defendant's relation to the principal—the plaintiffs do not plead any non-conclusory allegations that HSBC had any relationship with AQI.  Similarly, on the fifth factor—defendant's state of mind—the plaintiffs do not plausibly allege that HSBC knowingly assumed a role in AQI's terrorist activities or otherwise knowingly or intentionally supported AQI.

Finally, on the sixth factor—the duration of defendant's assistance—the plaintiffs allege that HSBC provided banking services to ARB for twenty-five years.  That certainly bespeaks a lengthy relationship but not necessarily of assistance in terrorism.  *Cf. Halberstam*, 705 F.2d at 484 ("The length of time an alleged aider-abettor has been involved with a tortfeasor almost certainly affects

the quality and extent of their relationship and probably influences the amount of aid provided as well; additionally, it may afford evidence of the defendant's state of mind.").  As already noted, ARB is a large bank with vast operations, and the plaintiffs do not allege—even conclusorily—that most, or even many, of HSBC's services to ARB assisted terrorism.  Further, the plaintiffs' pleadings acknowledge that HSBC terminated its relationship with ARB in January 2005, ten months before the November 9 Attacks.  In these circumstances, the length of the relationship alone does not admit an inference of aiding and abetting terrorism.  That fact, together with the plaintiffs' failure adequately to allege that HSBC funds ever reached AQI, or any of the other factors relevant to aiding and abetting, compel the conclusion that the plaintiffs fail plausibly to plead a claim against HSBC even on their expansive view of JASTA.

Taken as true and viewed in the light most favorable to the plaintiffs, the allegations establish, at most, that, up until January 2005, HSBC helped ARB violate banking regulations despite knowing that ARB supported terrorist organizations.  Even were that proven, however, it would be an insufficient basis for liability under JASTA because the plaintiffs have failed to allege that HSBC knowingly assumed a role in AQI's terrorist activities or substantially assisted

AQI in those activities, specifically the November 9 Attacks.  We therefore

conclude that the plaintiffs' aiding-and-abetting claim fails.

## CONCLUSION

We have considered the plaintiffs' remaining arguments on appeal and

conclude that they are without merit.  We therefore AFFIRM the judgment of the

district court.